UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------x

THOMAS COX, JULIE FEINER, SUSAN HOTT,
SUSY KOSHKAKARYAN, YULIUS MUSTAFA,
GRETA SCHOENEMAN, et al.,                          **MEMORANDUM & ORDER**
                                                  17-CV-5172(EK)(VMS)
                    Plaintiffs,

              -against-

SPIRIT AIRLINES, INC.,

                    Defendant.

-------------------------------------x
ERIC KOMITEE, United States District Judge:

          The plaintiffs in this action allege that they

purchased tickets to fly on Spirit Airlines, a low-cost carrier,

between May 2012 and July 2017.  Given historical practices in

the airline industry, they say, they understood the advertised

price of their tickets to include the right to bring carry-on

bags on board, and were surprised when Spirit informed them —

generally during the boarding process — that they would have to

pay extra for the privilege.  They bring this action for breach

of contract and seek certification of a class of first-time

Spirit flyers.

          The judge previously assigned to the case dismissed

Plaintiffs' claims,[1] but the Second Circuit vacated and remanded

on the issue of whether the passengers' contracts included the

---

[1] The case was transferred to me on January 29, 2020.

right to take carry-on items onboard.  Spirit now moves for summary judgment, and Plaintiffs move for class certification. For the reasons set forth below, I DENY Defendant's motion for summary judgment and GRANT Plaintiffs' motion to proceed as a class.

## I.   Factual Background[2]

Since August 2010, Defendant Spirit Airlines has charged passengers for carry-on items.  Def. 56.1 ¶ 1.  Under Spirit's policy, passengers were allowed to carry on one size-restricted "personal item" free of charge.  Decl. of Tanner Huysman ("Huysman Decl.") ¶¶ 3-4, ECF No. 129-34.[3]  Spirit described this item as "something like a small backpack or purse."  *Id.*, Ex. 3 at 2, ECF No. 129-25.  Spirit charged for any carry-on items that were bigger than, or in addition to, the allotted personal item.  *See id.*  So, a passenger could be charged for a backpack they carried in addition to a purse, for example, or for a weekend bag they placed in the overhead

---

[2] The facts in this order are drawn from the parties' submissions in connection with the motion for summary judgment, including Defendant's Local Rule 56.1 Statement ("Def. 56.1" (ECF No. 129-2)), and Plaintiffs' opposition ("Pl. 56.1" (ECF No. 134-1)).  The facts are viewed in the light most favorable to Plaintiffs on the summary judgment motion.  Citations to a party's Rule 56.1 Statement incorporate the documents cited therein.  For convenience, Defendant's supporting memorandum of law will be referred to as "Def. Br." (ECF No. 129-1); Plaintiffs' opposition as "Pl. Opp." (ECF No. 134); and Defendant's reply as "Def. Reply" (ECF No. 136).

[3] The maximum size of this personal item has changed over the years.  As of at least January 2012, it had to be smaller than 16 inches x 14 inches x 12 inches, Decl. of Tracy Rich, Ex. 3, § 6.1, ECF No. 129-6; and as of at least June 2017, it had to be smaller than 18 inches x 14 inches x 8 inches. Huysman Decl., Ex. 3, ECF No. 129-36.

compartment.[4]  These rules — and the cost per carry-on item — changed over the years, and depended on when the passenger made payment (in advance versus at the gate).[5]

Plaintiffs purchased Spirit tickets between May 2012 and July 2017 through six online travel agents, or "OTAs."  The OTAs were Expedia, Travelocity, BookIt, CheapTickets, CheapOair, and Kiwi.  Pl. 56.1 ¶¶ 7-17.  Plaintiffs allege that neither these agents nor Spirit informed them that Spirit would charge fees for carry-on bags.  Second Amended Compl. ("SAC") ¶¶ 13-32, 39-40, 42, ECF No. 31.  Plaintiffs also contend that these charges came as a surprise because, during the time period at issue, "it was overwhelmingly the norm in the U.S. that a personal item and one carry-on were included in the price of an airline ticket."  Pl. 56.1 ¶ 48.  Spirit does not dispute that prior to 2012, it was the "near uniform" practice of airlines in the U.S. not to charge passengers for carry-on bags.  Def. Resp. to Pl. 56.1 ¶ 52.

As a "ticketless airline," Spirit did not provide printed tickets to its passengers.  Pl. 56.1 ¶ 60.  Indeed, when

---

[4] Spirit's website said in 2010 that one personal item (maximum size 16 x 14 x 12") would be "free"; one carry-on (max 22 x 18 x 10") would cost $20 online or $45 at the gate.  Huysman Decl., Ex. 8, ECF No. 129-31.  For reasons described below, the Plaintiffs in this case would not necessarily have encountered Spirit's website at all during the purchasing process.

[5] For example, in 2015, Spirit charged between $26 and $100 for one carry-on item, depending on when the passenger paid for it (during booking, before or after online check-in, or at the airport).  *See* Huysman Decl., Ex. 2, ECF No. 129-25.

Plaintiffs booked a Spirit flight through an OTA, Spirit
provided no information directly to them at all pre-purchase;
any information relating to the flight came from the OTA. *Id.*
¶ 61.  It is undisputed that each OTA displayed some statement
about the possibility of additional fees, either prior to
purchase or in a confirmation email, but Plaintiffs dispute that
these statements were sufficient to notify them prior to
purchase of Spirit's practice.  Specifically, Plaintiffs argue
that prior to purchase, the OTAs provided only inconspicuous
hyperlinks or fine print relating to "baggage fees" and
"optional services" (as opposed to disclosure relating
specifically to carry-ons).

       Spirit says that its agents (the OTAs) did provide
pre-purchase notification about its policy.  The airline invokes
OTA disclosures such as: the prices displayed "do not include
baggage fees or other fees charged directly by the airline for
the included flight," Def. 56.1 ¶ 18 (BookIt); the "airline may
charge additional fees for checked baggage or other optional
services," *id.* ¶¶ 24-25 (Expedia); "additional baggage fees may
apply," *id.* ¶¶ 32 (CheapTickets); "Baggage restrictions are part
of each individual airline's policy and may be subject to
change.  To check current baggage restrictions, visit your
Manage my booking section . . .," *id.* ¶ 31 (Kiwi); or a
hyperlink or button labelled "baggage fees," which would lead

the customer indirectly to a page listing individual carriers'
various fees (including for carry-on bags). *Id.* ¶ 26
(CheapOAir).  The OTAs also generally stated that the booking
was subject to the OTAs' own "Terms and Conditions" (not
Spirit's), with a hyperlink to those terms. *See id.* ¶ 33
(CheapOAir); *id.* ¶ 38 (CheapTickets); *id.* ¶ 39 (Kiwi); *id.* ¶ 40
(Expedia); *id.* ¶ 41 (Travelocity).  In turn, the OTAs' terms and
conditions each mentioned that bookings were subject to the
conditions of the airline or "supplier." *Id.* ¶¶ 35, 37, 40-41.

Since at least 2012, Spirit maintained a "Contract of
Carriage" document ("COCD") on its website — a document Spirit
invokes here. *Id.* ¶ 44.  The COCD has a section called "Carry-
On Baggage."  From January 2012 through April 2014, that section
of the COCD stated that one "carry-on bag is permitted in the
aircraft cabin" and that customers could also bring one personal
item on board.  Decl. of Tracy Rich ("Rich Decl."), Ex. 3,
§ 6.1, ECF No. 129-6.  It said that fees would apply for
personal items exceeding the permitted dimensions, but it did
not specifically mention fees for carry-ons. *Id.*[6]  Later —
beginning in April 2014 — the COCD added language that one

---

[6] Spirit's 56.1 Statement says that the COCD "stated, in relevant part"
that "Baggage charges apply to ALL checked items and also carry-on items
(size and weight charges may apply."  Def. 56.1 ¶ 42.  However, this
statement was not in the section on "Carry-On Baggage" – it was in a separate
section called "Conditions for Acceptance of Special Items," which discussed
"special" items such as antlers, archery equipment, alcohol, or bicycles.
Rich Decl., Ex. 3, § 6.4, ECF No. 129-6.

"carry-on bag is permitted in the aircraft cabin *for a charge.*" Rich Decl., Ex. 4, § 6.1, ECF No. 129-7 (emphasis added).

It is undisputed that Spirit did not provide a copy of its COCD to consumers before they purchased a ticket via an OTA. Though Spirit's own website contained a link to its COCD, none of the OTAs included Spirit's COCD or even a hyperlink thereto. Pl. 56.1 ¶ 63; Def. Resp. to Pl. 56.1 ¶ 64.  Since at least May 3, 2017 (near the very end of the putative class period), Spirit has also "maintained a copy of its COCD available for public inspection at each of its airport [sic]" and "all locations where its tickets are sold in the United States; and upon request provided a copy of its COCD for no charge by mail or delivery service."  Def. 56.1 ¶ 44.[7]

## II.  Procedural Background

Plaintiffs filed this lawsuit against Spirit in August 2017.  ECF No. 1.  They filed their second amended complaint – the operative complaint here – in May 2018, alleging breach of contract, unjust enrichment, and fraud.  ECF No. 31.  On November 26, 2018, the assigned judge dismissed Plaintiffs'

---

[7] There is a discrepancy in Spirit's materials regarding the date its COCD became available at airports.  Spirit's Rule 56.1 Statement says Spirit has maintained a copy of its COCD at airports since May 2017, *id.*, but the underlying declaration says that Spirit has maintained a copy of its COCD at each of its airports since May 3, 2012.  Decl. of Tracy Rich ¶ 7, ECF No. 129-3.  The exhibits to this declaration confirm that the COCD was on Spirit's website as of April 2012, but they show nothing about when it became available at airports.

claims in their entirety.  *See Cox v. Spirit Airlines, Inc.*, 340 F. Supp. 3d 154, 156 (E.D.N.Y. 2018), *vacated and remanded*, 786 F. App'x 283 (2d Cir. 2019).  As relevant here, the district court held that the Airline Deregulation Act ("ADA"), 49 U.S.C. Section 41713(b)(1), preempted Plaintiffs' breach-of-contract claim.  *Cox v. Spirit Airlines, Inc.*, 340 F. Supp. 3d at 157-59. Plaintiffs appealed, pursuing only the breach-of-contract claim. *Cox v. Spirit Airlines, Inc.*, 786 F. App'x at 284.

        The Second Circuit vacated the decision on the breach-of-contract claim (but not the other claims) and remanded.  *Id.* It held that the ADA did not preempt Plaintiffs' contract claim and explained that "[w]hether, in light of state-law principles of contract interpretation, the carriage of Plaintiffs' carry-on items was in fact within the scope of Spirit's obligations, is a question for the district court to consider in the first instance."  *Id.* at 285.  On that question, the Court of Appeals "conclude[d] only that, in light of what appear to be ambiguities in the contract that Plaintiffs allege Spirit to have breached, and our conclusion that ADA preemption does not apply, Plaintiffs' breach of contract claim was not dismissible on the pleadings."  *Id.* at 285-86.  Citing prior Circuit precedent, the panel held that the "price" term in Spirit's contract with its passengers was "an ambiguous term" — specifically as to whether the price included the right to carry

on one or more items.  *Id.* at 286 (citing *Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010)).

### III. Spirit's Motion for Summary Judgment

### A.  Legal Standard

Summary judgment is appropriate if the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a).  "A fact is material for these purposes if it might affect the outcome of the suit under the governing law. An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 212 (2d Cir. 2001).[8]

The moving party has the burden of demonstrating the absence of a dispute of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  If the movant carries its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).  Absent such

---

[8] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

evidence, the Court will grant summary judgment.  The entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## B.   Discussion

Spirit's summary judgment motion raises two primary questions: (1) whether the "price" term of the contract included carry-on bags, as a matter of New York contract law, and (2) whether Spirit successfully incorporated its Contract of Carriage document by reference into the ticket authorizing Plaintiffs' travel on Spirit.  If the answer to either question is yes, summary judgment is appropriate.  I conclude that the answer to both questions, however, is no.

### 1.   Whether the Term "Price" Included Carry-On Baggage

The parties agree that New York law governs the state-law contract analysis here.[9]  Against that backdrop, "the initial question for the court on a motion for summary judgment with respect to a contract claim is whether the contract is

---

[9] There are two factors complicating the parties' agreement that New York's contract law governs; both are discussed below.  First, Spirit contends that certain federal regulations cabin (or preempt) the contract law analysis.  And second, while the parties agree that New York law governs the *existing* plaintiffs' contract claims, the motion for class certification would subsume plaintiffs as to whom a different choice-of-law analysis would likely prevail.

unambiguous with respect to the question disputed by the parties." *Law Debenture Tr. Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 465 (2d Cir. 2010).[10]  "The matter of whether the contract is ambiguous is a question of law for the court." *Id.* (citing *Bailey v. Fish & Neave*, 8 N.Y.3d 523, 528, 868 N.E.2d 956, 959 (N.Y. 2007)).

> An ambiguity exists where the terms of the contract
> could suggest more than one meaning when viewed
> objectively by a reasonably intelligent person who has
> examined the context of the entire integrated
> agreement and who is cognizant of the customs,
> practices, usages and terminology as generally
> understood in the particular trade or business.

*Id.* at 466.  No ambiguity exists, on the other hand, where the "contract language has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." *Id.* at 467.  Relying on these passages from *Law Debenture*, the Second Circuit held that the contract language at issue – namely, the term "price" – is ambiguous.  *Cox*, 786 F. App'x at 286.  That directive forms the law of the case and is now binding on this Court.  *Manhattan Eye Ear & Throat Hosp. v. N.L.R.B.*, 942 F.2d 151, 156 (2d Cir.

---

[10] As a federal court sitting in diversity, this Court applies New York's choice-of-law rule.  The parties agree that this Court can apply New York law to the claims of each plaintiff.  *See* Def. Br. 17-18; Pl. Opp. 6 n. 3.  "[W]here the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry," *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997), and the Court thus applies New York law.

1991), *amended on reh'g*, (2d Cir. Oct. 24, 1991).[11]  And even if the Second Circuit had not reached the question, I would hold that Spirit's price term was ambiguous.

Where, as here, "the contract language creates ambiguity, extrinsic evidence as to the parties' intent may properly be considered" by the factfinder.  *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009).  On motions for summary judgment, "the court may resolve ambiguity in contractual language as a matter of law if the evidence presented about the parties' intended meaning [is] so one-sided that no reasonable person could decide the contrary."  *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 158 (2d Cir. 2000).  "A court may also grant summary judgment regarding the interpretation of ambiguous language if the non-moving party fails to point to any relevant extrinsic evidence supporting that party's interpretation of the language."  *Id.*

---

[11] According to Spirit, the Court of Appeals' holding that the price term is ambiguous applies only at the pleading stage, where the appeal was decided.  Oral Argument Tr. 63:16-18, ECF No. 149.  But Spirit provides no support for the proposition that a term deemed "ambiguous" at the pleading stage might lose its ambiguity at summary judgment.  Indeed, "[a]mbiguity is determined by looking within the four corners of the document, not to outside sources." *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009) (quoting *Kass v. Kass*, 696 N.E.2d 174 (N.Y. 1998)).  Moreover, the case on which the Second Circuit relied in holding that "price" is ambiguous – *Law Debenture*, 595 F.3d 458 - was decided at the summary judgment stage.

a.   Industry Practice

The most salient extrinsic evidence here is industry practice.[12]  To resolve the ambiguity in the price term, it is relevant whether (and how many) other airlines were charging for carry-on bags during the relevant period.  If this was Spirit's unique innovation, a reasonable person would expect that service to be included in the price; the more airlines that did the same thing, however, the less reasonable it would be for a purchaser to expect the price to include carry-ons.  Plaintiffs proffer the report of Matthew Klint, a putative travel-industry expert, who states that "it was overwhelmingly the norm in the U.S. that a personal item and one carry-on were included in the price of

_____

[12] Spirit argues that the Court cannot consider extrinsic evidence of industry custom unless it is "fixed and invariable," and that it is Plaintiffs' burden to prove that "industry custom and practice was fixed and invariable."  *See* Def. Br. 15.  This is incorrect, however, because the "fixed and invariable" industry custom standard is used to determine whether a term is ambiguous in the first place.  See *Law Debenture*, 595 F.3d at 465-66 ("An ambiguity exists where the terms of the contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."); *see also British Int'l Ins. Co. v. Seguros La Republica, S.A.*, 342 F.3d 78, 84 (2d Cir. 2003) (explaining, in the context of determining whether a contract term was ambiguous, that a party seeking to provide "trade usage must establish either that the party sought to be bound was aware of the custom, or that the custom's existence was 'so notorious' that it should have been aware of it"); 12 Williston on Contracts § 34.12 (4th ed. 2020) ("At common law, the requisites for incorporating a custom or usage, in order that it could be considered as entering into a contract and forming a part of it, are that it must be ancient or long-established, certain, continuous, uniform, general, notorious, reasonable, and not in contravention of law.").  Because the Second Circuit already concluded that the term was ambiguous, *see Cox*, 786 F. App'x at 286, Spirit's "fixed and invariable" standard does not apply.

an airline ticket" during the relevant period.  Pl. 56.1 ¶ 48;
Expert Rep. of Matthew Klint ("Klint Rep.") ¶¶ 7-11, ECF No.
134-3.  Indeed, the record indicates that the three airlines
that charged for carry-on bags – Frontier, Allegiant, and Spirit
– had a 2.3 percent U.S. market share in 2012, less than 5
percent market share between 2013 and 2015, and approximately 7
percent market share in 2016 and 2017.  Pl. 56.1 ¶¶ 50-54.
Based on these numbers and other record evidence, the jury could
well conclude that the "reasonable consumer" would have expected
that the right to carry items on board was included in the
ticket price.

Spirit contends that its practice of charging for
carry-ons was "neither new nor unique" because the "entire
industry had been moving toward unbundling" of prices.  Def. Br.
13.  But moving towards something and doing it are of course
different things.  Spirit notes that other low-cost carriers
began unbundling carry-on bags shortly after Spirit: Allegiant
in April 2012, and Frontier in August 2013.  *Id.*; Def. 56.1
¶¶ 3, 4.  Spirit argues that the relevant "industry segment" is
the "ultra-low cost" segment of the airline industry, not the
industry as a whole, and that fees for carry-on items were
common in this segment by the time most plaintiffs booked their
flights in 2014 through 2016.  Def. Br. 19-20.  Spirit does not
explain persuasively, however, why these three airlines would

constitute the relevant market, as opposed to the airline
industry itself.

Spirit also contends that by June 2017 (when one
plaintiff — Feiner — booked her flight), more established
carriers like United and American Airlines offered basic economy
fares that excluded carry-ons from the price or banned them
entirely.  *Id.* (citing Expert Rep. of Darin Lee ("Lee Rep.") ¶
22, ECF No. 129-74).  In response, however, Plaintiffs' expert
explains that these fares "were only rolled out in limited
markets on only a small subset of fares within economy class by
the end of the relevant period [June 30, 2017]."  Expert
Rebuttal Rep. of Matthew Klint ("Klint Reb. Rep.") ¶ 16, ECF No
134-5.  A jury could reasonably conclude that these economy
fares remained outliers at the time.

  b. OTA Disclosures

A dispute of fact also exists as to whether the OTA
disclosures would have informed a reasonable person that the
price term included carry-ons.  This case is perhaps unusual for
a breach-of-contract class action, in that the purchasers making
up the class are suing a counterparty (Spirit) with whom they
had no direct interaction prior to purchase.  Instead, the
purchasers bought Spirit tickets on the OTAs' websites, reading
disclosures written by the OTAs (as Spirit's agents) rather than
Spirit itself.  As set forth below, however, the OTAs' websites

all had key features in common — most notably, that none of the OTAs' websites mentioned carry-on fees by that name prior to the purchase of a Spirit ticket.  On the contrary, Spirit's own evidence shows that they instead used links to "baggage fees" to lead consumers (in theory) to any disclosure of Spirit's carry-on fees.

The question of whether a reasonable person would have understood these references to "baggage fees" to mean they would be charged for carry-ons is a question of "inquiry notice." Under New York law, "a party is bound by contract terms if he is on inquiry notice of them and assents to them through conduct that a reasonable person would understand to constitute assent." *Starke v. Squaretrade, Inc.*, 913 F.3d 279, 289 (2d Cir. 2019). To determine whether inquiry notice has been given, "New York courts look to whether the term was obvious and whether it was called to the offeree's attention"; this, in turn, depends on "whether the contract terms were presented to the offeree in a clear and conspicuous way."  *Id.*

"In the context of web-based contracts, [courts] look to the design and content of the relevant interface to determine if the contract terms were presented to the offeree in way that would put her on inquiry notice of such terms."  *Id.*  Courts "may (and should) consider the level of difficulty in accessing the incorporated terms in our analysis of clarity and

conspicuousness." *Soliman v. Subway Franchisee Advert. Fund Tr., Ltd.*, 999 F.3d 828, 839 (2d Cir. 2021) (applying California law but noting it is "substantially similar" to New York law on the issue of contract formation); *e.g.*, *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 23 (2d Cir. 2002) (declining to enforce terms of use that "would have become visible to plaintiffs only if they had scrolled to the next screen") (applying California law), quoted in *Starke*, 913 F.3d at 289-90 (applying New York law). In addition, "New York courts find that binding contracts are made when the user takes some action demonstrating that they have at least constructive knowledge of the terms of the agreement, from which knowledge a court can infer acceptance." *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 25 (2d Cir. 2010).

Thus, the question for the jury, here, is whether the OTAs' various references to "baggage fees" put passengers on notice that Spirit would charge for carry-ons. Spirit argues that the various "Baggage Fee" links on the OTA websites did confer such notice. But Spirit provides no evidence showing that *any* OTA included the phrase "carry-on fee," or any explicit reference to carry-on bags at all, prior to purchase.[13]

_____

[13] Defendant has provided *partial* facsimiles (through screenshots) of the six OTAs' websites prior to purchase. Their 56.1 Statement does not point to them all in a single, user-friendly way. The summary-judgment

Moreover, the OTAs that included a "baggage fees" hyperlink *prior* to purchase (CheapOair, BookIt, and Expedia) neither required action on the part of the consumer, nor indicated that the consumer was consenting to additional fees by making a reservation.  While searching for flights on CheapOair, a consumer could click on a "Baggage Fees" link depicted in the red circle (which I added) in the image below:



---

record includes, however, the following: two screenshots of CheapOair's booking page, Decl. of Werner Kunz-Cho, Exs. C and D, ECF Nos. 130-16, 130-17; CheapOair's "checked baggage fees" page with "Spirit" typed into search bar, Decl. of Tristan Morales ("Morales Decl."), Ex. 16, ECF No. 129-61; BookIt's "guest support" page, "Hotel and Flight Results" page, "airline baggage rules" page, flight selection page and "continue" button (for Airtran Airways), and final booking page, Decl. of Robert Monod, Exs. A, C-F, ECF Nos. 130-5, 130-7 to 130-10; and Expedia's "baggage fee" page and "New Flight Search" page (for a Delta Airlines flight).  Morales Decl., Exs. 12 and 13, ECF No. 129-57 to 129-58.

Def. 56.1 ¶ 26; Decl. of Werner Kunz-Cho ("Kunz-Cho Decl."), Ex.
C at 1, ECF No. 130-16.[14]  Clicking on this link would lead the
consumer to a page called "Checked Baggage Fees" — not carry-on
baggage fees — and once at that page, the consumer would still
have to type Spirit's name to find its terms amidst those of
every airline for which CheapOair sold tickets:



Def. 56.1 ¶ 26.  Nothing about this multi-step process clearly
indicates assent on the part of the consumer.  *See, e.g., Scotti*

---

[14] Where this order underlines words in quotations, the underlined words
were hyperlinked.

*v Tough Mudder Inc.*, 63 Misc. 3d 843, 851 (Sup. Ct. N.Y. Co.
2019) ("[A] court cannot presume that a person who clicks on a
box that appears on a . . . screen has notice of all contents
not only of that page but of other content that requires further
action (scrolling, following a link, etc.)." (quoting *Applebaum
v. Lyft, Inc.*, 263 F. Supp. 3d 454, 466 (S.D.N.Y. 2017)).

    BookIt, in turn, included the following statement and
"<u>baggage fees</u>" link at the top of its "Hotel + Flight Results"
page:



Decl. of Robert Monod ("Monod Decl."), Ex. C at 1, ECF No. 130-
7.  The statement (circled in red above) says: "The prices shown
below include taxes and fees, but do not include <u>baggage fees</u> or
other fees charged directly by the airline for the included
flight."  *Id.; see also* Pl. 56.1 ¶ 18.  After selecting a flight
but before clicking a "CONTINUE" button, another statement said:
"Estimated Baggage Fees & Charges . . . Prices do not include

<u>baggage fees</u> or other fees charged directly by the airline for the included flight." Pl. 56.1 ¶ 20 (citing Monod Decl., Ex. E at 2, ECF No. 130-9). As noted, the "baggage fees" category is not coterminous with "carry-on fees." Moreover, clicking the "baggage fees" link led to another page with a long list of airlines, including Spirit, with another hyperlink that says: "<u>View Spirit Airline's Baggage Rules</u>." Monod Decl., Ex. D at 2, ECF No. 130-8. There was no language directing the customer to click on the "<u>baggage fees</u>" link or indicating that by booking, she was consenting to Spirit's additional carry-on fee. *Cf. Starke*, 913 F.3d at 293 (plaintiff was not bound to arbitrate claims because the "Squaretrade email in no way signals to Starke that he should click on the link, and it does not advise him that he would be deemed to agree to the contract terms in the document to be found by clicking on the link").[15]

It is undisputed that Expedia included a link concerning baggage fees prior to purchase, but the parties

_____

[15] Spirit says that several places on BookIt's website would have provided an estimate for carry-ons, but none of the places it points to actually do so. For example, Spirit contends if a customer clicked "<u>View Full Itinerary</u>" on the "Hotel + Flight Results" page, "BookIt's website provided the customer with estimated baggage fees, including carry-on bag fees"; but the exhibit on which Spirit relies does not show what happened when a customer clicked on "View Full Itinerary" and says nothing about carry-ons. Def 56.1 ¶ 19; Monod Decl., Ex. C, ECF No. 130-7. Spirit also contends that before a "CONTINUE" button, and again before a "BOOK IT" button, "Spirit's carry-on fee of $35 would have shown under 'Carry On,'" Def. 56.1 ¶¶ 20-21. But the visuals Spirit provides are for Airtran Airways and American Airlines, not Spirit. *Id.* Moreover, Plaintiff Shirin Begum testified that she never received that information during booking. Dep. of Shirin Begum 69:16-22, ECF No. 134-10.

dispute what the link said and where it appeared.  An Expedia
"New Flight Search" page from July 2012 contains, in small font
and at the very bottom of the page, a statement that says,
"Prices are per person and do not include baggage fees or other
fees charged directly by the airline."  Decl. of Tristan Morales
("Morales Decl."), Ex. 13 at 3, ECF No. 129-58.  Citing the
testimony of Expedia's Bryan Bachrad, Spirit states that
"[s]ince at least 2015, 'on the flight search results page,
definitely Expedia was showing pricing for carry-on bags and
checked bags.'" Def. 56.1 ¶ 23 (quoting Dep. of Bryan Bachrad
84:12-14, ECF No. 129-59).  But Bachrad provided little
specificity about the link – saying only that it was "a link
that says something along the lines of check baggage fees here"
and that he was "not exactly sure" if it would have been "a link
or the actual baggage fees that the customer would have been
expected to pay."  Dep. of Bryan Bachrad 77:3-6, 79:8-13.  A
screenshot of Expedia's website from April 2015 does show a
hyperlink to "Baggage Fee Information" – but for a Delta
Airlines flight, unhelpfully.  Morales Decl., Ex. 12, ECF No.
129-57.  And it is not clear whether this page appeared as part
of the booking process, or on a "Deals" page – as the top of the
screenshot suggests.  *Id.*  Accordingly, the Court cannot
conclude as a matter of law that Expedia's link met New York's
contract-law requirements.

All six OTAs provided confirmation emails with
"Baggage Fee" links *after* purchase, but Spirit has failed to
establish that these links sufficiently notified Plaintiffs of
contract terms — for several reasons.  First, these were post-
purchase statements and therefore did not, without more, become
part of the contract already entered.  *See e.g.*, *Schnabel v.
Trilegiant Corp.*, 697 F.3d 110, 126 (2d Cir. 2012) ("[T]hat
someone has received an email does not without more establish
that he or she should know that the terms disclosed in the email
relate to a service in which he or she had previously enrolled .
. . .").  Though "providing contract terms after a transaction
has taken place may be an appropriate way to contract in certain
situations," the offeree must actually be "put on notice of the
existence of additional contract terms before it can be said
that he has assented to them."  *Starke*, 913 F.3d at 295.  Here,
no OTA indicated to the consumers that the confirmation pages or
emails contained *additional* terms, as opposed to a confirmation
of booking and sale.  *Cf. id.* (even where consumer knew he would
receive a post-sale "service contract" and had thirty days to
rescind it for a refund, he did not have notice of the
inconspicuous additional terms hyperlinked in the email).

　　　　Second, regardless of timing, these hyperlinks did not
necessarily establish assent on the part of the customer.
Expedia's confirmation email said that "the airline may charge

additional fees for *checked baggage* or other optional services,"
Pl. 56.1 ¶¶ 23-24 (emphasis added), and the parties have
indicated that Travelocity used the same language.[16]
CheapTickets similarly stated: "Additional baggage fees may
apply." *Id.* ¶¶ 32, 38.  CheapOair's confirmation page said,
"Most airlines charge baggage fees, check the Baggage Fees for
complete details." *Id.* ¶ 28.

One OTA — CheapOair — sent a confirmation email that
did contain a link with the word "carry-on" ("Please click the
Baggage and Carry on Fees link for complete details . . . .").
But it was written in small font and following lengthy flight
details and, notably, a large-font statement that "Your ticket
is non-refundable."  Morales Decl., Ex. 18 at 2-3, ECF No. 129-
63.  BookIt's confirmation "Voucher" also contained the word
"carry on" in a chart of estimated fees, but the parties dispute
what was written in that column.  Spirit argues that in 2012, a
consumer would have seen a price of $35 under a column called
"carry on".  Def. 56.1 ¶¶ 20, 22 (citing Monod Decl., Ex. G at
2, ECF No. 130-11).  Plaintiffs maintain, however, that the
confirmation email sent to plaintiff Begum in 2012 stated "N/A"

---

[16] Spirit has not provided a visual of Travelocity's interface – before
or after purchase.  Plaintiffs' expert indicated that Travelocity, which is
owned by Expedia, used this language from Expedia quoted here, Klint Rep. 14
n.21, and Defendant does not dispute this. *See* Def. Br. 14 n.6 (citing Klint
Rep.).  It not clear, however, whether Travelocity used this language during
confirmation alone, or also prior to purchase.  Without more, the Court
cannot conclude that Travelocity included any pre-purchase disclosure.

under "carry on."  Pl. 56.1 ¶ 19 (citing Dep. of Shirin Begum 118:2-4, ECF No. 134-10 (Q: And what does your contract say about the price of a carryon?  A: Not applicable.); then citing Klafter Decl., Ex. N at 2, ECF. No. 134-16 (email from Begum to Spirit indicating that the confirmation email she received from BookIt said "N/A" for "carry on")).[17]

Finally, Kiwi's confirmation said, "Baggage: 1 x Personal Item – MAX 42 x 32 x 20 cm, 10 kg," followed by the statement: "Baggage restrictions are part of each individual airline's policy and may be subject to change.  To check current baggage restrictions, visit your Manage my booking section at Kiwi.com.  *It is usually much cheaper to order checked baggage with us in advance than to pay for it at the airport*."  Def. 56.1. ¶ 31.  It is thus not clear that a reasonable person would have believed he had consented to pay additional fees for *carry-ons*.  And Kiwi's statement, taken as a whole, actually indicates that it is referring to checked baggage rather than carry-ons.

Furthermore, Plaintiffs' travel expert proffered some logical reasons for purchasers at the time to believe that

---

[17] Spirit's exhibit – the "Voucher" that Spirit says plaintiff Begum "would have" received – provides little clarity, as it actually lists the fee for a carry-on as "$40" (not $35).  According to BookIt's Flight Compliance Manager, this discrepancy exists because "the price auto-populates on the day the record is pulled.  Because a copy of this Voucher was pulled in 2020 . . . the carry-on fee auto-populated as $40."  Monod Decl. 5 n.6.  If, indeed, the carry-on fee auto-populates on the day the record is pulled, the Court has no way of knowing whether the chart in 2012 would have said "$35," "N/A," or something else.

"baggage fees" would refer only to checked baggage.  For
example, he notes that "Spirit Airlines itself publicly uses the
terms 'checked baggage' and 'baggage' interchangeably."  Klint
Rep. ¶ 26 ("At Spirit's airport ticket counters, signs state
'Baggage Dropoff' which clearly refer to checked bags (since
carry-on items, by definition, are not checked).  In the
"Baggage Claim" area downstairs (again, not used for carry-in
[sic] items), a sign refers passengers to "Spirit Airlines
Baggage.").[18]  Viewed in the light most favorable to Plaintiffs,
they have adduced sufficient evidence to establish a dispute of
fact on this point.

> 2.    Spirit's Contract of Carriage Document

Spirit argues that even if the OTAs' websites didn't
put Plaintiffs on inquiry notice, Plaintiffs nevertheless agreed
to be charged extra for carry-ons because they were bound by
Spirit's "contract of carriage" document.[19]  That document does,

---

[18] It bears mentioning that the federal regulations governing "baggage
fees" discuss both checked and carry-on baggage.  *See* 14 C.F.R. § 399.85.  In
addition, the Convention on International Civil Aviation, to which the U.S.
is a party, defines the term "baggage" as "[p]ersonal property of passengers
or crew carried on an aircraft by agreement with the operator."  Convention
on International Civil Aviation, Annex 9, § 1-1, Oct. 2019,
https://www.icao.int/WACAF/Documents/Meetings/2018/FAL-
IMPLEMENTATION/an09_cons.pdf.

However, Spirit does not argue — and the Court does not conclude — that
a factfinder assessing the "baggage fees" links on OTA websites would be
required to take account of a regulatory definition of the word "baggage."
*Cf.* Def. Br. 14 (noting - in a parenthetical - that "Carry-on baggage, of
course, is a type of 'baggage.'" (citing 14 C.F.R. § 399.85(d)).

and did since at least 2014, expressly state that Spirit will charge extra for carry-ons.  Pl. 56.1 ¶¶ 42-43.  There are two theories by which Plaintiffs may be bound by Spirit's COCD: (1) the terms of the COCD were incorporated by reference into the ticket through the operation of federal regulations, or (2) Plaintiffs expressly agreed to the terms of Spirit's COCD, as a matter of New York contract law.  Spirit fails to demonstrate the absence of a material factual dispute for either theory.

      a.    Whether Spirit Incorporated the Terms of its COCD Under FAA Regulations

Under the first theory, Spirit could have incorporated the terms of its COCD by reference, but only if it complied with the Federal Aviation Administration's specific requirements. FAA regulations "set uniform disclosure requirements, which preempt any State requirements on the same subject, for terms incorporated by reference into contracts of carriage for scheduled service in interstate and overseas passenger air transportation."  14 C.F.R. § 253.1; *see also* Ticketless Travel:

---

[19] Spirit refers to this document as its contract of carriage, and plaintiffs do not expressly dispute that nomenclature.  But federal regulations use the phrase "contract of carriage" to mean the agreement between a carrier and a passenger — which is not necessarily the same (absent compliance with FAA regulations) as the document that the airline maintains at its airport offices or on its website.  *See* 14 C.F.R. §§ 253.4-253.5.  Spirit can title the document on its website whatever it wants, but whether the terms contained in that document were incorporated into the actual contract of carriage between the airline and its passengers is the key issue in dispute in this case.

Passenger Notices, 61 Fed. Reg. 1309-01, 1310 (Jan. 19, 1996) (FAA request for comments) ("Part 253 preempts state courts from involvement in the issue of notice of contract terms, so long as carriers comply with its provisions.").

But an air carrier may incorporate terms by reference — and thereby bind a passenger to those terms under federal regulations — only if it meets certain notice requirements:

> A ticket or other written instrument that embodies the contract of carriage may incorporate contract terms by reference (i.e., without stating their full text), and if it does so *shall contain or be accompanied by notice to the passenger as required by this part.* In addition to other remedies at law, an air carrier may not claim the benefit as against the passenger of, and *the passenger shall not be bound by, any contract term incorporated by reference if notice of the term has not been provided to that passenger in accordance with this part.*

14 C.F.R. § 253.4(a) (emphasis added). The regulations go on to prescribe the form that the "notice to the passenger" required by Section 253.4(a) must take:

> [E]ach air carrier shall include on or with a ticket, or other written instrument given to a passenger, that embodies the contract of carriage and incorporates terms by reference in that contract, *a conspicuous notice that*:
>
>> (a) Any terms incorporated by reference are part of the contract, passengers may inspect the full text of each term incorporated by reference at the carrier's airport or city ticket offices, and passengers have the right, upon request at any location where the carrier's tickets are sold within the United States, to receive free of charge by mail or other delivery service the full text of each such incorporated term.

14 C.F.R. § 253.5 (emphasis added).  An airline must then make good on the promises contained in that notice.  See *id.* § 253.4(b)–(c).  As Section 253.5(a) suggests, airlines must conspicuously notify the purchaser that the relevant term is incorporated in the purchase contract, *and* make the text of that term available in the specified ways, if they want to bind passengers to its terms.  Each air carrier shall (1) "make the full text of each term that it incorporates by reference in a contract of carriage available for public inspection at each of its airport and city ticket offices," *id.* § 253.4(b); (2) "provide free of charge by mail or other delivery service to passengers, upon their request, a copy of the full text of its terms incorporated by reference in the contract," *id.* § 253.4(c); and (3) "keep available at all times, free of charge, at all locations where its tickets are sold within the United States information sufficient to enable passengers to order the full text of such terms."  *Id.*

District courts in this circuit have had occasion to assess other airlines' compliance with Section 253.  In *Dennis v. Delta Air Lines, Inc.*, for example, the court held that Delta complied with Part 253 because the OTA (Orbitz) included a "Notice of Incorporated Terms of Contract" specifically stating that air transportation was subject to the air carrier's

individual terms, "which are herein incorporated by reference
and made part of the contract of carriage."  No. 10-CV-973, 2011
WL 4543487, *2 (E.D.N.Y. Sept. 29, 2011).  Further, a "copy of
the Rules was available for public inspection at LaGuardia
Airport, which provided notice to passengers of the incorporated
conditions of carriage."  *Id.*[20]  And in *Reed v. Delta Airlines,
Inc.*, the court held that Delta satisfied Section 253 by making
"its International Conditions of Carriage available for public
inspection at JFK Airport, and provid[ing] a 'ticket notice' at
check-in counters to advise passengers of the existence of
incorporated conditions of carriage and to notify passengers
that they could request full copies of the conditions from
Delta."  No. 10-CV-1053, 2011 WL 1085338, at *3 (S.D.N.Y. 2011).

        Here, in contrast, there remains a dispute of fact as
to whether Spirit satisfied the requirements of Part 253.
Spirit concedes that "not all of the OTAs expressly stated that
the text of the COC was available at the airport or ticket
offices."  Def. Reply 14.  Indeed, it appears CheapOair is the
only OTA that even arguably met all of Part 253's requirements

---

[20] Though not mentioned in the opinion, Delta's "Notice of Incorporated
Terms of Contract" also stated that the customer had "the right to inspect
the full text of each transporting carrier's terms at its airport and city
ticket offices" and the "right, upon request, to receive free of charge the
full text of the applicable terms incorporated by reference from each of the
transporting air carriers."  *See* Exs. A–C to Aff. of Louis R. Martinez at 14,
*Dennis v. Delta Air Lines, Inc.*, No. 10-CV-973, ECF No. 22-3 (E.D.N.Y.
E.D.N.Y. Sept. 29, 2011).

in its terms and conditions.  *See* Kunz-Cho Decl., Ex. B at 8,
ECF No. 130-15.[21]  CheapTickets included most of the required
notices but did not inform passengers that they have the right,
upon request, to receive free of charge by mail or other
delivery service the full text of each such incorporated term.
*See* Def. 56.1 ¶ 37.  The other OTAs' terms and conditions either
included none of the required notices, *see id.* ¶ 39 (Kiwi);
simply directed the customer to read the supplier's "full terms
and conditions of carriage" on the supplier's website, *see id.* ¶
40 (Expedia); or informed the customer that it would be bound by
additional terms and conditions of third-party suppliers,
without any mention of COCs.  *See id.* ¶ 41 (Travelocity).[22]

---

[21] Plaintiffs do not dispute that CheapOair included the items required
by Part 253, but they maintain that CheapOair did not provide "conspicuous
notice" of these terms.  When booking a ticket on CheapOair, a customer had
to click an orange "BOOK" button below the following statement: "By clicking
BOOK, I agree that I have read and accept CheapOair.com's Terms and
Conditions of purchase."  Kunz-Cho Decl., Ex. C at 2, ECF No. 130-16.  Spirit
relies on *Covino v. Spirit Airlines, Inc.*, 406 F. Supp. 3d 147, 152 (D. Mass.
2019).  That case concerned the disclosure on Spirit's own website, not the
OTAs'.  The court held that Spirit satisfied Section 253's requirements
because "Spirit's online booking page explain[ed] in plain language that by
assenting to Spirit's terms and conditions by checking the relevant box, the
passenger is agreeing to Spirit's COC" and "Spirit then provide[d] on the
same page a link to the complete text of the COC to which the passenger [was]
agreeing."  *Id.*  Here, neither CheapOair – nor any of the relevant OTAs –
provided a link to Spirit's COCD; thus, it is not clear that "Spirit provided
[plaintiff] an opportunity to become fully informed of the contractual
provisions to which she was agreeing by booking her air travel with Spirit."
*Id.*  *Covino's* reasoning does not compel summary judgment for Spirit here.

In any event, because the record contains no evidence that Spirit made
its COCD publicly available (as discussed further below), I need not
definitively resolve the question of whether Spirit provided "conspicuous
notice" through CheapOair.

And even if the terms and conditions of one OTA, CheapOair, included the required information, the evidence suggests that Spirit did not have its COCD available at airports when most Plaintiffs purchased their tickets, as required by Section 253.4(b).  A declaration from Spirit's "Systems and Procedure" manager says that Spirit had the COCD available in airports as of April 2012, *see* Rich Decl. ¶ 7, but Spirit's own statement of material facts says it "maintained a copy of its COC available for public inspection at each of its at airports and city ticket offices and all locations where its tickets are sold in the United States" as of "May 3, 2017 to the present." *See* Def. 56.1 ¶ 44.  This was *after* all but one of the plaintiffs made their purchases.[23]  Even if every OTA included conspicuous links to terms and conditions properly incorporating Spirit's COCD and *informing* passengers of its availability, federal regulations still required Spirit actually to make the

_____

[22] Spirit's 56.1 Statement does not address BookIt's terms and conditions, and Spirit does not argue that BookIt incorporated by reference the terms of Spirit's COCD or otherwise included the required notices under Section 253.4.  The Court located in the record what appear to be different versions of BookIt's terms and conditions, *see* ECF Nos. 130-6 and 130-11, but neither says anything about airlines' contracts of carriage.  Accordingly, I cannot conclude that Spirit properly incorporated the terms of its COCD through that platform.

[23] Plaintiff Feiner purchased her ticket on June 5, 2017, from Kiwi.com. Pl. 56.1 ¶ 17.  As discussed, Spirit has provided no evidence that Kiwi properly incorporated the terms of Spirit's COCD in its terms and conditions. Thus, even if Spirit's COCD was available for public inspection at the time Feiner bought her ticket, the notice requirements of Section 253.5(a) were not met.

COCD available at each of its airport and city ticket offices.
Summary judgment on this ground is not appropriate.

   b. Spirit's Alternative State-Law Argument

   Spirit's second theory is that Plaintiffs are bound to
the terms of its COCD because they *assented* to those terms under
state contract law.  This contention overlooks the fact that
Part 253 appears to preempt state-law not only when a carrier
complies with its notice requirements, but also when it *fails* to
comply with them.  Put differently, I read the preemption of
state contract law to work in both directions — when the
contract-of-carriage terms become binding under FAA regulations,
and when they do not.  Section 253.4 states that "an air carrier
*may not claim the benefit* as against the passenger of, and the
passenger *shall not be bound by, any contract term incorporated
by reference* if notice of the term has not been provided to that
passenger in accordance with this part."  14 C.F.R. § 253.4(a)
(emphasis added); *see also Price v. Delta Airlines*, *Inc.*, 5 F.
Supp. 2d 226, 232 (D. Vt. 1998) ("If notice complying with 14
C.F.R. § 253.4 was not provided, the Prices will not be bound by
the claim restriction term."); *Harrington v. Delta Air Lines,
Inc.*, No. 4-CV-12558, 2006 WL 1581752, at *5 (D. Mass. Feb. 21,
2006) (noting that even if defendants had violated Part 253's
notice regulations, plaintiffs would nonetheless be "barred from
privately enforcing those violations through the mechanism of

32

state law"). The preamble to Part 253 also supports this interpretation: "[T]his rule is designed to preempt the States only in one narrow area; the notice that must be given to passengers in cases where an air carrier incorporates some of its contract terms by reference." 47 Fed. Reg. 52,128, 52,131 (Nov. 19, 1982); *see also id.* at 52,132 ("[W]here the required notice is found not to be conspicuous or not given at all . . . the penalty provision voiding the term comes into effect."). Thus, to the extent there could be any state-law analysis here with regards Spirit's COCD, it would have to be that the OTAs *actually provided* the terms to consumers – not that they incorporated them by reference.

It is undisputed that no OTA included Spirit's terms on its website – by hyperlink or otherwise. Pl. 56.1 ¶ 64; Def. Resp. to Pl. 56.1 ¶ 64. At the very most, the OTAs mentioned the existence of additional terms from the "supplier," "carrier," or "provider" in their own terms and conditions. *E.g.*, Morales Decl., Exs. 28, 33-36, ECF Nos. 129-73, 129-78 to 129-31; Kunz-Cho Decl., Ex. B, ECF No. 130-15; Monod Decl., Ex. B, 130-6. *Cf. Covino v. Spirit*, 406 F. Supp. 3d 147, 152 (D. Mass. 2019) (during booking, Spirit provided a link to the complete text of its COCD). Because the OTAs purported to incorporate Spirit's terms by reference, the question of whether

they succeeded in doing so *as a matter of state law* is preempted by Part 253.

*     *     *     *     *

For the foregoing reasons, Spirit's motion for summary judgment is denied.  Certain disputes of fact remain on the state-law contract analysis of whether a reasonable consumer would have understood the "price" term to include carry-ons. Specifically, the parties dispute whether industry practice would have put passengers on notice during the relevant time period, and whether common characteristics of the OTA disclosures (e.g., "baggage fee" links) would have informed them that carry-ons were excluded from the price paid.  A dispute of fact also remains as to whether Spirit complied with the FAA regulations to incorporate by reference its COCD into Plaintiffs' contracts; this question will be resolved by determining whether Spirit took the requisite steps under Section 253.[24]

---

[24] Spirit also seeks dismissal of plaintiff Amemado's claim on the ground that it is barred by the applicable statute of limitations.  The Court agrees.  New York's borrowing statute, C.P.L.R. § 202, provides that "when a nonresident sues on a cause of action accruing outside New York, the cause of action must be timely under the limitation periods of *both* New York and the jurisdiction where the cause of action accrued."  *Homeward Residential, Inc. v. Sand Canyon Corp.*, 499 F. Supp. 3d 18, 24 & n.5 (S.D.N.Y. 2020).  "New York law locates the cause of action for breach of contract causing financial harm at 'the place of injury,' which 'usually is where the plaintiff resides and sustains the economic impact of the loss.'"  *Muto v. CBS Corp.*, 668 F.3d 53, 60 (2d Cir. 2012) (quoting *Glob. Fin. Corp. v. Triarc Corp.*, 93 N.Y.2d 525, 529 (1999)); *see also Vincent v. Money Store*, 915 F. Supp. 2d 553, 568 (S.D.N.Y. 2013) ("Absent unusual circumstances . . . [a] cause of action

## IV.   Motion for Class Certification

Plaintiffs move to certify a class under Rule 23 of the Federal Rules of Civil Procedure.  The proposed class would include first-time fliers of Spirit Airlines who purchased their Spirit flight through certain OTAs[25] during the period August 31, 2011, through July 31, 2017.  Spirit opposes the motion for class certification.

### A.   Legal Standard

To obtain class certification, Plaintiffs must satisfy the requirements of Rule 23 by a preponderance of the evidence. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011); *In re IPO Secs. Litig.*, 471 F.3d 24, 41-42 (2d Cir. 2006).  Plaintiffs must first establish the Rule 23(a) factors: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the

---

accrues where the plaintiff resides and sustains the economic impact of the loss, rather than where the defendant committed the wrongful acts.").

Plaintiff Amemado is a resident of Ontario, Canada, and it is undisputed that he resided there when he booked his Spirit ticket in June 2014.  Pl. 56.1 ¶ 12.  Ontario's two-year statute of limitations for breach-of-contract claims thus applies.  *See, e.g., 2138747 Ontario, Inc. v. Samsung C & T Corp.*, 103 N.E.3d 774, 776 (N.Y. 2018).  Because this litigation was not filed until August 31, 2017 – over three years after he purchased his ticket – his claim is barred and is hereby dismissed.

[25] Plaintiffs propose that the class action would involve the following OTAs: "those presently owned by Expedia Group (Expedia, Travelocity, Orbitz and Cheaptickets), Fareportal (CheapOAir) and Booking Holdings (Priceline and Cheapflights), Kiwi.com, and Bookit.com."  Pl. Class Cert. Mot. 1 n.1.  As noted below, however, I will limit the class to the six OTAs whose terms the parties briefed on summary judgment.

claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a).

Plaintiffs must also satisfy Rule 23(b).  Here, Plaintiffs claim to have done so under Rule 23(b)(3), which requires the Court to find two things: first, "predominance" — that "questions of law or fact common to class members predominate over any questions affecting only individual members."  *Id.* 23(b)(3).  And second, "superiority" — "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  *Id.*  In addition, the Second Circuit "recognize[s] an implied requirement of ascertainability" – that is, it must be "feasible for the court to determine whether a particular individual is a member" of the class.  *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015).

**B.   Discussion**

Spirit contends that Plaintiffs fail to satisfy three factors: "commonality" under Rule 23(a), and "predominance" and "superiority" under Rule 23(b)(3).  I conclude that Plaintiffs have carried their burden on these issues for class certification.  However, I re-define the proposed class slightly: the class will be comprised of first-time fliers of Spirit who purchased their Spirit flight through any of the six

36

OTAs already at issue,[26] during the period of August 31, 2011 through May 3, 2017 (instead of August 31, 2022), and whose claims are governed by U.S. law.  *See Marisol A. v. Giuliani*, 126 F.3d 372, 379 (2d Cir. 1997) ("Rule 23(d) allows the district court to make such orders as are necessary to assure the orderly administration of the proceedings."); *see also Boucher v. Syracuse Univ.*, 164 F.3d 113, 118 (2d Cir. 1999) ("District judges have broad discretion over class definition.").

The reason for this new end to the date range is that, as set out above, it is undisputed that Spirit made its COCD publicly available at airports (and thus complied with at least that requirement of Section 253) as of at least May 3, 2017. The reason for limiting the OTAs to the six already at issue is that the Court has already examined those six OTAs and determined that common questions exist across them, as discussed further below.

1.   Rule 23(a) Factors

Spirit does not dispute that Plaintiffs have established numerosity, adequacy, and typicality.

Numerosity is "presumed at a level of 40 members." *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d

---

[26] Expedia, Kiwi, CheapOair, CheapTickets, Travelocity, and BookIt.

Cir. 1995).  Though the number of first-time Spirit fliers during the relevant period is not clear at this stage, Spirit has provided Plaintiffs with data showing that during the time period at issue, over two million passengers booked a Spirit ticket through one of the relevant OTAs and paid a carry-on fee. *See* Decl. of Jeffrey Klafter ¶ 18, ECF No. 128-2; *see also* Stipulation dated October 15, 2020, ECF No. 138-19.  Plaintiffs have also established adequacy because their interests are not "antagonistic to the interest[s] of other members of the class" and "plaintiff's attorneys are qualified, experienced and able to conduct the litigation."  *See Baffa v. Donaldson*, 222 F.3d 52, 60 (2d Cir. 2000).  Finally, Plaintiffs satisfy the typicality requirement, which asks whether "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability."  *In re Flag Telecom Hldgs., Ltd. Secs. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009).  "Minor variations in the fact patterns underlying the individual claims do not preclude a finding of typicality."  *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 405-06 (S.D.N.Y. 2015) (quoting *Robinson v. Metro-North Commuter R.R.*, 267 F.3d 147, 155 (2d Cir. 2001)).  The claims of the class representatives are typical of those of the class: they claim breach of contract by Spirit under the same legal

theories and make similar factual allegations relating to the same course of conduct and injury.

Commonality – which Spirit does dispute – is closely related to typicality. *See Marisol A.*, 126 F.3d at 376 ("The commonality and typicality requirements tend to merge into one another, so that similar considerations animate analysis of Rules 23(a)(2) and (3)."). Commonality "requires the plaintiff to demonstrate that the class members have suffered the same injury" and that there is "a common contention" among the class "that is capable of class wide resolution — which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 349–50. Plaintiffs must identify at least one issue common to all class members. *See id.* at 359 (noting that to satisfy the commonality requirement, "even a single common question will do"); *see also Trief v. Dun & Bradstreet Corp.*, 144 F.R.D. 193, 198 (S.D.N.Y. Sept. 22, 1992) ("[C]ourts have liberally construed the commonality requirement to mandate a minimum of one issue common to all class members.").

Here, at least two common questions arise: (1) whether a reasonable person purchasing a Spirit ticket on an OTA would have been on notice that a carry-on was excluded from the price paid, and (2) whether Spirit's ticket sales through OTAs

complied with the requirements of 14 C.F.R. §§ 253.4–.5 for
incorporation by reference.  The first question is capable of
common resolution because the factfinder can look to the same
extrinsic evidence for all class members to determine the
reasonable meaning of the ambiguous price term in Spirit's
contracts.  Likewise, the second question will require the
factfinder to examine when and where Spirit was posting its
"Contract of Carriage," among related questions.

It is true that the six OTAs maintained their own
websites, and that each OTA had its own disclosure that differed
slightly in language and appearance from the other OTAs.  But
the OTAs' disclosures raise uniform questions that can be
resolved across the board.  Specifically, the factfinder will
need to resolve the questions of whether, based on industry
practice at the time, a reasonable consumer purchasing a Spirit
ticket on *any* of the six OTAs would have expected to be charged
for carry-on items; whether "baggage fee" links like the ones at
issue here would have informed a reasonable consumer of Spirit's
carry-on practice; and whether Spirit complied with Section 253
such that the terms of its COCD were incorporated by reference.
Class members' claims "need not be identical for them to be
common; rather, Rule 23(a)(2) simply requires that there be
issues whose resolution will affect all or a significant number

of the putative class members." *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015).

    2.   <u>Rule 23(b) Factors</u>

      Plaintiffs have also carried their burden of proving that they meet the predominance and superiority requirements of Rule 23(b).

      a.  Predominance

      Similar to commonality, the "predominance requirement is satisfied if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 118 (2d Cir. 2013).  That some individual inquiries may arise does not preclude predominance, so long as the common questions predominate. *E.g.*, *Dover v. Brit. Airways, PLC (UK)*, 321 F.R.D. 49, 58 (E.D.N.Y. 2017) ("This is not to say that individual issues will not arise in this case.  On the contrary, the parties agree that individualized proof will be necessary in determining the amount of damages each class member suffered.").  There is no predominance, for example, where a court must resolve plaintiffs' contract claims by looking at "individualized

extrinsic evidence." *In re U.S. Foodservice*, 729 F.3d at 124-25.

Here, common questions and evidence will predominate.

i.   Disparities in OTA Disclosures

The remaining material factual disputes are common across all six OTAs.[27]  The Court has already disposed of the disputes that might have required individualized inquiries – namely: (1) whether any of the six OTAs included conspicuous pre- or post-purchase language disclosing "carry-on" fees, as opposed to "baggage" or "optional services" (no); and (2) whether any of the six OTAs provided sufficient notice of the terms of Spirit's COCD such that Plaintiffs actually assented to be bound to those terms under New York law (also no).  Thus, although the OTAs do differ, those differences are not material and will not require individual examination.  *See In re U.S. Foodservice*, 729 F.3d at 124 ("[C]ourts properly refuse to certify breach of contract class actions where the claims require examination of individual contract language.  In such cases, however, courts have determined that the language variations were material to the issue of breach."); *see also id.*

_____

[27] Notably, Spirit's argument that there are no common questions, and that individual questions predominate, is made at the level of the *individual consumer* rather than the individual OTA.  Spirit argues, for example, that an individual might have actually been aware of Spirit's practice because he learned about it from a friend, or clicked on one of the "baggage fee" links.  Spirit does not argue, however, that the need to examine each OTA's disclosure precludes commonality or predominance.

(rejecting defendant's argument that contracts had "materially
different terms and that the variations among them defeat[ed]
plaintiffs' attempt to establish predominance" because, among
other things, the "question of breach with regard to plaintiffs'
contract claims [would] focus predominantly on common
evidence"); *cf. Sacred Heart Health Sys., Inc. v. Humana Mil.
Healthcare Servs., Inc.*, 601 F.3d 1159, 1171-72 (11th Cir. 2010)
(no predominance where, among other things, differences in
payment clauses across 300 contracts were "reducible
linguistically to a minimum of around 33 variants" such that the
"diversity of the material terms [was] overwhelming").  It is
the case here, as it was with the "cost-plus contracts" at issue
in *U.S. Foodservice*, that the OTAs' terms and conditions are
"substantially similar in all material respects," even if they
are not identical.  729 F.3d at 124.

> ii.  Disparities in Individual Passengers'
>      Idiosyncratic Notice

Spirit argues that the finder of fact will need to
assess individualized extrinsic evidence to determine whether
any members of the class had actual notice of Spirit's practices
(and, therefore, did not suffer an injury).  Spirit argues, for
example, that some members of the putative class might have
learned about Spirit's practice from siblings, friends, or other
individuals who told them that Spirit charges for carry-on bags.

*See* Def.'s Opp. to Class Cert. ("Def. Opp. Class Cert.") 21, ECF No. 133.  But a court need not assure itself that that there is *no* uninjured member of a class.  In *Kohen v. Pacific Investment Management Company LLC*, Judge Posner held that it was proper – if not necessary – to certify a class even where some class members have not been injured:

> [A] class will often include persons who have not been injured by the defendant's conduct; indeed this is almost inevitable because at the outset of the case many of the members of the class may be unknown, or if they are known still the facts bearing on their claims may be unknown. Such a possibility or indeed inevitability does not preclude class certification . . . .

571 F.3d 672, 677 (7th Cir. 2009).  "[A] class should not be certified," however, "if it is apparent that it contains a great many persons who have suffered no injury at the hands of the defendant." *Id.*  Here, the class is limited to first-time flyers on Spirit, thus excluding anyone who would have prior *personal* experience with Spirit's allegedly novel fee structure. And the record reveals no reason to believe that a "great many persons" in the class, so defined, would have conversed with siblings or friends about Spirit's carry-on policies.

Spirit relies on *Axiom Investment Advisors, LLC v. Deutsche Bank AG*, 2018 WL 4253152, (S.D.N.Y. Sept. 6, 2018) for its predominance argument, but *Axiom* is inapposite.  There, the court denied class certification based on its observation that

the "extrinsic evidence suggests that a substantial proportion of class members understood the provisions to allow the practice" about which the plaintiffs complained. *Id.* at \*4; *see also id.* at \*7 (Deutsche Bank's challenged practice was "commonly known in the [foreign exchange] market"); *id.* (Deutsche Bank "disclosed the practice to at least a significant number of customers"); *id.* at \*8 (noting "the substantial evidence in the record that many of Deutsche Bank's clients were aware of the bank's use of post-receipt price withdrawals"). The class in that case, however, was comprised largely of sophisticated institutional foreign exchange traders whose job it was to assess transaction costs (and thus to be aware of practices like Deutsche Bank's "last look" pricing mechanism). *Id.* at \*7.   The proposed class members here are individual consumers.

Moreover, in contrast to *Axiom*, Spirit has failed to demonstrate that any particular putative class member was actually aware of the practice, let alone a substantial proportion. *E.g.*, *In re U.S. Foodservice*, 729 F.3d at 121 ("The record does not contain a single piece of evidence suggesting 'actual individual knowledge' on the part of a specific customer of [the alleged fraud]."). Instead, Spirit relies on hypotheticals: a putative class member "*could have*" read Plaintiffs' expert's blog post discussing Spirit's carry-on

fees; "visited Spirit's website; seen Spirit's advertising; heard about Spirit's fees from a family member or friend who flew on Spirit or worked at Spirit, heard about Spirit's fees from a complete stranger who previously flew Spirit"; or flown on another airline that also charges for carry-ons.  Def. Opp. Class Cert. 16 (emphasis added).

Spirit also points to media mentions of its *à la carte* pricing policy, including the blog post and articles from the Wall Street Journal, ABC News and CBS News.  Huysman Decl., Exs. 11-21, ECF Nos. 129-34 to 129-44.  By this point, however, it is a cliché that consumers are inundated with information,[28] and the likelihood that a "substantial proportion" of Spirit's customers saw a blog post or happened to catch a particular three-minute segment on ABC News is vanishingly small.  *See Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 277 F.R.D. 97, 118–19 (S.D.N.Y. 2011) ("Sheer conjecture that class members 'must have' discovered [the misrepresentations] is insufficient to defeat Plaintiff's showing of predominance when there is no admissible evidence to support Defendants' assertions."), *quoted in In re U.S. Foodservice*, 729 F.3d at 121–22.

---

[28] *E.g.*, Paul Hemp, *Death by Information Overload*, Harv. Bus. Rev. (Sept. 2009), https://hbr.org/2009/09/death-by-information-overload.

iii. Disparities in State Contract Law

Spirit also argues that individualized inquiries into the context and formation of each contract would predominate in a nationwide class because of material variations in state contract law.  It is true that district courts must "undertake a considered analysis of the differences in state laws" in class actions.  *Langan v. Johnson & Johnson Consumer Cos*, 897 F.3d 88, 97 (2d Cir. 2018).  But "[v]ariations in state laws do not necessarily prevent a class from satisfying the predominance requirement," *id.*, and "these concerns are lessened where the states' laws do not vary materially."  *In re U.S. Foodservice*, 729 F.3d at 127.

Spirit points to potential differences between state laws dictating how to determine whether an ambiguity exists and whether extrinsic evidence is allowed to answer that question, *see* Def. Opp. Class Cert. 24-25, but that will not be a question for the factfinder here: the Second Circuit already determined that an ambiguity exists in this case.  *Cox*, 786 F. App'x at 286.  The Second Circuit has also explained, in the context of breach-of-contract claims, that "state contract law defines breach consistently such that the question will usually be the same in all jurisdictions."  *In re U.S. Foodservice*, 729 F.3d at 127 (citing *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 233 n.8 (1995) ("[C]ontract law is not at its core diverse, nonuniform,

and confusing.")); *see also Hanks v. Voya Ret. Ins. & Annuity Co.*, 492 F. Supp. 3d 232, 240 (S.D.N.Y. 2020) ("the law of breach is materially uniform across state jurisdictions, meaning that there are no actual conflicts of law"); *In re AXA Equitable Life Ins. Co. COI Litig.*, 2020 WL 4694172, No. 16-CV-740 (S.D.N.Y. Aug. 13, 2020) (predominance and superiority requirements were "unaffected by the fact that class members' policies may be subject to different states' laws because . . . 'state contract law defines breach consistently such that the question will usually be the same in all jurisdictions.'" (quoting *In re U.S. Foodservice*, 729 F.3d at 127)).

       iv.  Disparities in Statutes of Limitations

Finally, Spirit argues that potential variations in limitations periods defeat predominance. Generally speaking, however, potential differences in limitations periods do not preclude class certification. *See* William B. Rubenstein, 2 Newberg on Class Actions § 4:57 (5th ed. 2021) ("Statute of limitations defenses . . . rarely defeat class certification."). This is because "[v]ariations in limitations periods are irrelevant to whether there exist common questions of law or fact that go to the heart of Defendants' potential liability as to the claims alleged." *In re Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527, 573 (S.D.N.Y. 2021); *see also Steinberg v. Nationwide Mut. Ins. Co.*, 224 F.R.D. 67, 78

(E.D.N.Y. 2004) ("Courts have been nearly unanimous in holding
that possible differences in the application of a statute of
limitations to individual class members, including the named
plaintiff, does not preclude certification of a class action so
long as the necessary commonality and . . . predominance[] are
otherwise present."); *In re Linerboard Antitrust Litig.*, 305
F.3d 145, 163 (3d Cir. 2002) ("Challenges based on the statute
of limitations . . . have usually been rejected and will not bar
predominance satisfaction because those issues go to the right
of the class member to recover, in contrast to underlying common
issues of the defendant's liability."); *Waste Mgmt. Holdings,
Inc. v. Mowbray*, 208 F.3d 288, 296 (1st Cir. 2000) ("As long as
a sufficient constellation of common issues binds class members
together, variations in the sources and application of statutes
of limitations will not automatically foreclose class
certification under Rule 23(b)(3)."). If, as Spirit asserts,
the claims of some class members will time-barred under relevant
state laws, "those defenses can and will be raised at a later
date." *In re Namenda*, 338 F.R.D. at 573; *see also* Newberg
§ 4:57 ("[I]f statute of limitations issues are somewhat
individualized, courts deem that these concerns can be resolved

during the damage phase of the case and need not preclude certification of liability issues.").

        b.   Superiority

      Plaintiffs have likewise established superiority by a preponderance of the evidence. Even where common issues predominate, certification is still improper if "a class action is not a superior method of adjudicating [the] claims." *In re U.S. Foodservice*, 729 F.3d at 130. Rule 23(b)(3) sets forth a non-exclusive list of factors pertinent to superiority, including: whether class members wish to bring, or have already brought, individual actions; the desirability of concentrating the litigation of the claims in the particular forum; and the difficulties of managing the case as a class action. Fed. R. Civ. P. 23(b)(3). Manageability is "the most critical concern in determining whether a class action is a superior means of adjudication." *Sykes v. Mel S. Harris & Assocs., LLC*, 780 F.3d 70, 82 (2d Cir. 2015). Spirit argues that a class action is an inferior method of adjudicating this dispute because the Court cannot adjudicate the putative class claims "without conducting plaintiff-specific mini-trials at which each putative class member testifies about what she knew and understood" about

Spirit's practice of charging for carry-ons.  Def. Opp. Class
Cert. 29.

      As discussed, however, the Court need not individually
assess each plaintiff's subjective intent; rather, the Court can
look at class-wide extrinsic evidence to determine whether a
reasonable consumer would have known Spirit charged for carry-
ons, and whether Spirit complied with Section 253 such that
Plaintiffs were bound by the terms Spirit claims to have
incorporated by reference.  And because there are common issues
of law and fact between all class members, "litigating in a
common forum provides efficiency and a more suitable use of
system resources than individual actions."  *Torres v. Gristede's
Operating Corp.*, 2006 WL 2819730, No. 4-cv-3316, *16 (S.D.N.Y.
Sep. 29, 2006). Moreover, according to Plaintiffs, there are no
related actions pending, and thus no putative class member has
an interest in prosecuting or defending separate actions.  *See*
Klafter Decl. ¶ 23.

      Spirit also contends that litigating class claims in
this forum is undesirable because the question of personal
jurisdiction will require "individualized jurisdictional
inquiries" when Spirit moves to dismiss the claims of class
members with no nexus to this forum.  Def. Opp. Class Cert. 29.
Spirit relies on *Bristol-Myers Squibb Co. v. Superior Court*, 137
S. Ct. 1773 (2017), which involved a state-court coordinated

mass action, not a class action in federal court.  *Id.*  The only
two circuits that have spoken on the issue – the Sixth and
Seventh – have held that *Bristol-Myers* does not apply to federal
class actions.  As the Seventh Circuit wrote, "*Bristol-Myers*
neither reached nor resolved the question whether, in a Rule 23
class action, each unnamed member of the class must separately
establish specific personal jurisdiction over a defendant."
*Mussat v. IQVIA, Inc.*, 953 F.3d 441, 447 (7th Cir. 2020), *cert.*
*denied*, 141 S. Ct. 1126 (2021); *see also id.* (distinguishing
between *Bristol-Myers* plaintiffs, who "brought a coordinated
mass action, which . . . does not involve any absentee
litigants," from lead plaintiffs in a Rule 23 class action, who
"by contrast . . . earn the right to represent the interests of
absent class members by satisfying all four criteria of Rule
23(a) and one branch of Rule 23(b)").  Likewise, the Sixth
Circuit noted that the "vast majority of lower courts have
rejected" defendants' arguments that *Bristol-Myers Squibb* can
render nationwide class actions invalid for lack of specific
personal jurisdiction, "as has the only circuit court [the
Seventh] to have so far addressed the issue. . . . We follow
their lead in holding that *Bristol-Myers Squibb* does not extend
to federal class actions."  *Lyngaas v. Ag*, 992 F.3d 412, 434–35
(6th Cir. 2021).

3.  <u>Ascertainability</u>

Finally, I find no impediment to ascertaining the contours of the putative class.  "The ascertainability doctrine that governs in this Circuit requires only that a class be defined using objective criteria that establish a membership with definite boundaries."  *In re Petrobras Sec.*, 862 F.3d 250, 265 (2d Cir. 2017) ("declin[ing] to adopt heightened ascertainability theory that requires a showing of administrative feasibility at the class certification stage").

Spirit argues that it is "impossible to determine . . . which flight was a passenger's first, or the circumstances under which the passenger paid the fee" because Spirit "does not have complete data sets prior to 2011."  Def. Opp. Class Cert. 22, 23 n.8.[29]  Spirit also notes that even if it did have that information, Plaintiffs never asked for it and discovery is now closed.  *Id.* at 23.  However, Spirit stipulated that it could identify all "individuals, who during the Proposed Class period, booked a flight on Spirit through the OTAs and who paid a carry-on fee."  Stipulation dated October 15, 2020, at 3, ECF No. 128-9; Def. Opp. Class Cert. 23.  Even if Spirit cannot specify who

---

[29] Spirit raises this argument as part of the "predominance" inquiry, whereas Plaintiffs raise it as part of the "ascertainability" inquiry.  I address it under "ascertainability" because the argument relates to whether the class can be defined along objective boundaries.

was a first-time flier, anyone who was *not* a first-time flier
during the proposed period will appear twice in Spirit's
records.  The fact that Spirit does not have complete records
prior to 2011 is not meaningful because Spirit only began
charging for carry-ons in April 2010, leaving only an eight-
month period during which a class member *might* have flown for a
first time unrecorded.  Moreover, the Court will not "reward
[Defendants'] imperfect record-keeping practices by precluding
class certification" on this ground.  *Zyburo v. NCSPlus, Inc.*,
44 F. Supp. 3d 500, 503 (S.D.N.Y. 2014); *see also Tyson Foods,
Inc. v. Bouaphakeo*, 577 U.S. 442, 461 (2016) (noting that
failing to keep complete records was a problem of defendant's
own making).

          To identify individuals who first flew during those
eight months, the Court can employ the use of sworn affidavits
or proofs of claim.  *See Langan*, 897 F.3d at 91 n.2 ("In
*Petrobras*, we cited approvingly the district court's grant of
certification where the district court allowed putative class
members to provide a sworn affidavit indicating when and where
they purchased the olive oil at issue . . . [W]e see no
ascertainability problem with having the class members submit
sworn affidavits describing the circumstances under which the
purchases were made." (citing *Petrobras*, 862 F.3d at 267)); *see
also Bitzko v. Weltman, Weinberg & Reis Co., LPA*, No. 117-CV-

458, 2019 WL 4602329, at *15 (N.D.N.Y. Sept. 23, 2019) ("[T]here is evidence in the record that suggests that Defendant's records can identify, at least as a preliminary matter, who is a consumer.  The individuals so identified can be asked a simple [question] about whether their debt at issue qualifies as consumer debt in conjunction with class notification.").  Aside from citing unfairness – that Plaintiffs cannot offer assurances of the truth of such affidavits, and that Spirit would have no way of contesting them – Spirit does not meaningfully dispute the Second Circuit's approval of this method to determine membership in the class.  *See* Def. Supp. Ltr. 3, ECF No. 151.

Accordingly, I conclude that Plaintiffs have met the requirements for class certification under Rule 23 by a preponderance of the evidence.  Class certification is appropriate notwithstanding minor differences between the six OTAs at issue.  If I deem it necessary or appropriate, as a matter of prudent case management, to certify sub-classes at future stages of this litigation, I will do so.  *See* William B. Rubenstein, 3 Newberg on Class Actions § 7.30 (5th ed. 2021) ("Courts will generally consider subclassing when the need arises."); *Marisol A.*, 126 F.3d at 379 ("Rule 23 gives the district court flexibility to certify subclasses as the case progresses . . . ."); *see also Richardson v. Byrd*, 709 F.2d 1016, 1019 (5th Cir. 1983) ("Under Rule 23 . . . [t]he district

judge must define, redefine, subclass, and decertify as appropriate in response to the progression of the case from assertion to facts.").

## V.    Conclusion

For the foregoing reasons, Defendant's motion for summary judgment is denied.  However, I dismiss plaintiff Amemado's claim because it is time-barred.  *See supra* Section III.B(2) n.24.

I grant Plaintiffs' motion for class certification, with some modifications.  Specifically, I certify the following class:  first-time fliers of Spirit who purchased their Spirit flight through the six OTAs already at issue – Expedia, Travelocity, Kiwi, CheapOair, CheapTickets, and BookIt – during the period of August 31, 2011 through May 3, 2017, and whose claims are governed by U.S. law.

SO ORDERED.

_____/s/ Eric Komitee_____
ERIC KOMITEE
United States District Judge

Dated:    March 29, 2022
          Brooklyn, New York