UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------x

THOMAS COX, JULIE FEINER, SUSAN HOTT,
SUSY KOSHKAKARYAN, YULIUS MUSTAFA,
GRETA SCHOENEMAN, et al.,                    **MEMORANDUM & ORDER**
                                              17-CV-5172(EK)(VMS)
                    Plaintiffs,


              -against-

SPIRIT AIRLINES, INC.,

                    Defendant.

------------------------------------x
ERIC KOMITEE, United States District Judge:

          In March 2022, I issued an order denying Spirit

Airline's motion for summary judgment and granting Plaintiffs'

motion for class certification.  Order dated March 29, 2022, ECF

No. 152 ("Opinion").  Spirit moved for reconsideration shortly

thereafter, ECF No. 153, and I held oral argument on the

reconsideration motion and solicited supplemental briefing from

the parties on certain discrete issues.  *See* Tr. of Oral Arg. on

Mot. for Recons. 88-90, ECF No. 159 ("Tr.").  For the reasons

that follow, I now amend the Opinion in three ways: I delete

footnote 12; delete two references to the online travel agents'

("OTAs") having acted as Spirit's agents; and amend a statement

(taken from Spirit's own briefing, but which Spirit now

disavows) concerning the dates that Spirit's contract of

carriage was posted in airports.  I DENY reconsideration on all other grounds.

## I.      Legal Standard

A motion for reconsideration will ordinarily be granted only when the "moving party can point to controlling decisions or data that the court overlooked — matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995).  "There are generally three grounds for reconsideration: (1) an intervening change in the law, (2) the availability of evidence not previously available, and (3) the need to correct clear error or prevent manifest injustice." *In re Zyprexa Prods. Liability Litig.*, 653 F. Supp. 2d 181, 182 (E.D.N.Y. 2009).  A motion for reconsideration is not "a vehicle for relitigating issues already decided"; because these arguments merely "reiterate or repackage an argument previously rejected by the court," they offer no basis for reconsideration. *Awadallah v. W. Union Co.*, No. 14-CV-3493, 2017 WL 52584, at *1 (E.D.N.Y. Jan. 4, 2017).[1]

In its motion for reconsideration, Spirit relies on the third basis – that reconsideration is necessary to prevent

---

[1] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

manifest injustice.  Def.'s Mem. in Supp. of Mot. for Reconsideration 1, ECF No. 153-1 ("Def. Recons. Br.").[2]

## II. Discussion

**A.   Predominance**

      Spirit argues (again) that predominance should be found lacking, and no class can be certified, if even one putative class member "knew that Spirit charged separately for carry-on bags." *Id.* at 7.  As noted in my original opinion, this argument is foreclosed by (among other things) the Second Circuit's holding in *In re U.S. Foodservice Inc. Pricing Litigation*, 729 F.3d 108 (2d Cir. 2013).  There, U.S. Foodservice opposed class certification on the precise basis that Spirit does here: that individualized issues would predominate "because the key issue in this case is customer knowledge of the alleged pricing practice at issue." *Id.* at 119.  Notwithstanding this contention, the Second Circuit upheld the district court's conclusion that the issue would be decided predominantly on the basis of common evidence.  *Id.* at 125.

      For the reasons set out in my prior order, that is the case here, too.  *See, e.g.*, Opinion 12-14 (discussing industry practice evidence common to all passengers); *id.* at 14-25 (discussing common features of the OTAs' disclosures); *id.* at

---

[2] Page numbers in citations to record documents other than briefs refer to ECF pagination.

42-46 (assessing predominance in light of this and other evidence).  Indeed, the relevant evidence in this case is even more "common" and "generalized" than it appears to have been in *U.S. Foodservice*, where "each invoice obviously concerned different bills of goods with different mark-ups."  729 F.3d at 118; *see also id.* at 124 (noting U.S. Foodservice's argument that "the contracts [with the 75,000 customers at issue] here have materially different terms"); *id.* (referring to the contracts at issue as "numerous and varying").  Here, unlike there, Spirit's customers did not negotiate prices or contract terms; they took the price and each OTA's disclosure as they found them.

The cases on which Spirit relies do not support its sweeping assertion that the potential knowledge of even one class member should defeat certification.  In *Nicosia v. Amazon.com*, for example, the pre-certification record indicated that the sole *named* plaintiff was himself aware of the existence of the arbitration clause he claimed not to have read; he had received notice of the provision through the litigation itself and continued to make Amazon purchases thereafter.  834 F.3d 220, 234 (2d Cir. 2016).  Spirit also relies on *In re Asacol Antitrust Litigation*, 907 F.3d 42 (1st Cir. 2018), in which the district court had "*found* [at the class-certification stage] that approximately ten percent of the class had not suffered any

4

injury attributable to defendants' allegedly anticompetitive behavior."  *Id.* at 45 (emphasis added).[3]

Here, in contrast, Spirit is suggesting that customers *may* have received notice of Spirit's practice of charging for carry-ons from, *inter alia*, "the news media, from friends or family members who flew on Spirit, or even from bloggers." Def.'s Mem. in Supp. of Mot. for Summ. J. 5, ECF No. 129-1 ("Def. SJ Br.").[4]  There is an obvious difference between learning from the popular press that a company is pursuing a given practice, on the one hand, and knowledge that the company is seeking to impose a particular contractual provision on oneself, on the other.  Even if Spirit is correct to surmise that some portion of the putative class may have seen the cited news stories or blog, it does not follow that those individuals "cannot argue that [their] contract included a free carry-on nonetheless."  Def. Recons. Br. 7.

Take one example from Spirit's evidence: the online ABC News article titled "Spirit Airlines' New Seats Don't

---

[3] Even as it reversed the order certifying a class, the First Circuit was careful to note in *Asacol* that there is no requirement that every class member's injury be demonstrated prior to such certification.  *See id.* at 58 ("We also agree that it would put the cart before the horse to read Rule 23 to require that a plaintiff demonstrate prior to class certification that each class member is injured.").

[4] *See also* Def.'s Opp. to Class Cert. ("Def. Class Cert. Opp.") 15, ECF No. 133 (contending that class members may have learned of Spirit's extra fee "because, for example, they talked to a friend or neighbor, or read a blog, or went to a website . . . .").

Recline." *See* Ex. 13 to Decl. of Tanner Huysman ("Huysman Decl.") 3, ECF No. 129-36.  The statement in that piece that Spirit is "about to start charging for carry-on bags," *see id.*, does not mean that they were going to charge every passenger on every flight on every route.  Indeed, there is already evidence in this case that some airlines that charged fees for a given service did so on some routes but not others.  *See, e.g.*, Expert Report of Matthew Klint ¶¶ 17-18, ECF No. 134-5.  And there is also evidence that Spirit's fees for carry-on bags depended (at least in part) on the physical dimensions of the carry-on at issue — information that was surely not contained in every news story or blog post on the subject.  Huysman Decl. ¶¶ 3-4, ECF No. 129-23; ECF No. 129-36; Ex. 8 to Huysman Decl., ECF No. 129-31; Ex. 3 to Decl. of Tracy Rich § 6.1, ECF No. 129-6; Ex. A to Pl. Supp. Ltr., ECF No. 160-1.  Accordingly, Spirit lacks a plausible basis to claim that any class member — let alone a meaningful portion of the class — actually knew they would be charged when they entered into the contract at issue.[5]

---

[5] In support of its argument that class members may have learned of Spirit's practice from other sources, Spirit relies heavily on the fact that some customers purchased the right to carry on a bag prior to arriving at the airport.  This does not prove what Spirit says it does.  Spirit's own 30(b)(6) witness testified that Spirit emailed passengers "after their booking process" — specifically, that Spirit sent emails 72, 48, and 24 hours before a passenger was to check in.  The evidentiary record contains, among other things, a form email produced by Spirit bearing the subject heading "Save Money by Purchasing Bags Now for Your Upcoming Flight."  ECF No. 160-1. The body of that email states: "We noticed that you haven't purchased any carry-on or checked bags for your flight.  Planning to bring a carry-on or

The absence of such evidence should end the analysis. It bears mentioning, however, that even if a class member *had* seen an article or blog post, the relevance of that evidence would be far from clear.  Spirit cites no case that would require the Court to interpret the contracts in question based on knowledge gleaned from a news story, and the Court is aware of none.  New York (like most states) requires an objective assessment of the contracting parties' intent.  *Brown Bros. Elec. Contractors v. Beam Constr. Corp.*, 361 N.E.2d 999, 1001 (N.Y. 1977).  In that vein, it is axiomatic that what matters are the words of the contract itself, the conspicuousness of a term in a form agreement (for "inquiry notice" purposes), custom-and-usage evidence (where appropriate), and the like. The parties' words and actions matter; their "unexpressed intent[ions]" are irrelevant.  *Ashwood Cap., Inc. v. OTG Mgmt., Inc.*, 948 N.Y.S.2d 292, 296 (App. Div. 2012).  "A party's subjective understanding of an ambiguous term is not competent parol evidence to explain the term's meaning.  In determining

---

checked bag?  **Buy them online** now and save money!"  *Id.* (bold type in original).  Thus, passengers who wanted to get to their destination without paying even more money at the gate were incentivized to pay Spirit for their carry-on bag, even if their contract rights dictated otherwise.  For obvious reasons, the willingness of some passengers to pay in advance of their flight (but well after contract formation) says little about the parties' contractual intent.  Indeed, Spirit's counsel acknowledged this potential break in their logic at argument.  *See* Tr. 35:11-12 (Defense Counsel: "There could be an intervening link [between contract formation and payment for the carry-on], of course.").

the intent of the parties to an ambiguous contract, the only germane testimonial evidence is that concerning the objective manifestations of the parties' intent." Unmanifested Subjective Intent, 28 N.Y. Prac., Contract Law § 9:35.[6]

Even Spirit's preferred treatise here — Corbin on Contracts[7] — generally counsels a focus on the parties' *outward* manifestations of intent, such as the parties' "[p]reliminary negotiations and communications" with one another, "trade usage, course of dealing, and course of performance." 5 *Corbin on Contracts* § 24.10 (Joseph M. Perillo ed., rev. ed. 2022). Farnsworth's counsel is similar:

---

[6] "It is well established that the existence of a binding contract is not dependent on the subjective intent of the parties. Rather, in determining whether the parties entered into a contractual agreement and what were its terms, it is necessary to look . . . to the objective manifestations of the intent of the parties as gathered by their expressed words and deeds." *Doolittle v. Nixon Peabody LLP*, 6 N.Y.S.3d 864, 867 (App. Div. 2015). This sentiment echoes Judge Learned Hand's statement of a century prior:

> A contract has, strictly speaking, nothing to do with the personal, or individual, intent of the parties. A contract is an obligation attached by the mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent. If, however, it were proved by twenty bishops that either party, when he used the words, intended something else than the usual meaning which the law imposes on them, he would still be held, unless there were mutual mistake, or something else of the sort.

*Hotchkiss v. Nat'l City Bank of New York*, 200 F. 287, 293 (S.D.N.Y. 1911); *see also Skycom v. Telstar Corp.*, 813 F.2d 810, 814-15 (7th Cir. 1987) (where state contract law takes an objective view of "intent," "[s]ecret hopes and wishes count for nothing. The status of a document as a contract depends on what the parties express to each other and to the world, not on what they keep to themselves.").

[7] Corbin was "one of the great exponents of the subjective approach to intent." *Skycom Corp.*, 813 F.2d at 815.

> The overarching principle of contract interpretation is that the court is free to look to all the relevant circumstances surrounding the transaction.  This includes all writings, oral statements, and other *conduct* by which the parties *manifested* their assent, together with any prior negotiations between them and any applicable course of dealing, course of performance, or usage.

E. Allan Farnsworth, *Contracts* § 7.10 (3d ed. 1998) (emphases added).  Newspaper articles that one party may have read are absent from these treatises' extensive discussions of proper extrinsic evidence.

In any event, there is no evidence before the Court that any class member *did* view such articles.  Absent such admissible evidence of purchasers' knowledge, this case resembles *Public Employees' Retirement System of Mississippi v. Merrill Lynch & Co.*, 277 F.R.D. 97 (S.D.N.Y. 2011), cited in my initial order.  There, the district court certified a securities class action over the objection of defendants that "tens" or "perhaps hundreds" of thousands of individual victims "must have known of the conduct alleged in the Complaint."  *Id.* at 116.  The court rejected that predominance challenge, finding that the "evidence in the record that any class member knew of false statements" in the challenged prospectuses was "weak."  *Id.* at 118.  The *Merrill* court noted that the defendants' proffered evidence consisted — as it does here — of "largely inadmissible hearsay drawn from various news articles and public reports."

*Id.*  The court went on to observe that the "generic" statements

in those articles were not, in the end, probative of actual

knowledge that might support a defense.  *Id.*  That is equally

true here.

In sum, the law is clear that a defendant must offer

something more than speculation to defeat class certification.

*See id.* at 119 ("sheer conjecture" insufficient to defeat

predominance, absent admissible evidence).  Against this

standard, Spirit has not established that the Court will need to

conduct individualized inquiries about what news stories a class

member read, or what they may have heard from relatives, about

flying on Spirit.

In its motion for reconsideration, Spirit surfaced a

new theory about how putative class members might have known of

Spirit's practice: they might have been employed by Spirit.  In

response, Plaintiffs indicate that they do not oppose modifying

the class definition to exclude people who were employed by

Spirit at the time of their first Spirit flight during the Class

Period.  Pls.' Opp. to Mot. to Reconsider ("Pl. Recons. Opp.")

18 n.7, ECF No. 156.  Despite the fact that new arguments are

generally disfavored on motions for reconsideration, *Caribbean*

*Trading & Fid. Corp. v. Nigerian Natl Petroleum Corp.*, 948 F.2d

111, 115 (2d Cir. 1991), the class definition shall be amended

to exclude such individuals, given the absence of any
opposition.

**B.    Statute of Limitations**

Spirit now contends that the claims of four named
plaintiffs (Brua, Hott, Koshkakaryan, and Mustafa) are time-
barred.  Def. Recons. Br. 10.  This argument is both (a) waived
for summary-judgment purposes, and (b) without merit.

1.   Waiver

As Spirit concedes, it did not raise this argument in
its motion for summary judgment; instead, the contention made
its first appearance in Spirit's opposition to class
certification, in a brief section — less than one page —
entitled "Individualized Limitations Issues Also Prevent Class
Certification."  Def. Class Cert. Opp. 21.  Even then, Spirit
invoked the limitations issue not as a basis for dismissal, but
rather as a "factor" germane to the predominance analysis under
Federal Rule of Civil Procedure 23(b).  *See id.* (invoking the
limitations issue as a "difficulty" of trying this case on a
class-wide basis).

Where a party fails to raise a basis for summary
judgment in its motions papers, that argument is waived.  *E.g.,*
*Almonte v. Averna Vision & Robotics, Inc.*, 128 F. Supp. 3d 729,
755 n.21 (W.D.N.Y. 2015).  Spirit says it could not have raised
the limitations defense in summary-judgment briefing because it

lacked notice, at that point, that Plaintiffs were proceeding on
an "implied contract" theory — specifically, the theory that the
written price term in the contracts at issue implied the right
to carry onboard items for which Spirit charged extra.  Def.
Class Cert. Opp. 4.

This argument does not save Spirit from waiver: for
reasons explained in the next section, Spirit is incorrect that
Plaintiffs only belatedly "confirmed" that they were "proceeding
on an implied-in-fact contract theory."  Def. Recons. Br. 10.
Because the briefing on this point has been confused (at times),
however, I go on to consider this argument on the merits.

    2.   <u>Merits</u>

New York's "borrowing statute" uses the shorter of two
statutes of limitations: New York's and the statute of the state
where the claim accrued.  *Muto v. CBS Corp.*, 668 F.3d 53, 57
(2d Cir. 2012).  The statutes of limitations in at least two of
the named plaintiffs' home states — California and Arizona — set
shorter limitations periods for oral and implied contracts than
they do for contracts manifested in writing.  *See* Cal. Civ. Pro.
Code § 339 (establishing two-year limitations period for "[a]n
action upon a contract, obligation or liability not founded upon
an instrument of writing"); Ariz. Rev. Stat. § 12-543(1) (three-
year limitations period for obligations "not evidenced by a
contract in writing").

At oral argument and in supplemental briefing, the
parties diverged on the question of *what writing* memorializes
the contract between Sprint and a passenger.  *See generally* Tr.;
Pls.' Supplemental Ltr., ECF No. 160 ("Pl. Supp. Ltr."); Def.'s
Supplemental Ltr. ("Def. Supp. Ltr."), ECF No. 161.  Spirit
seized on Plaintiffs' use of the term "implied" to contend that
the shorter limitations periods apply.  *E.g.*, Tr. 48:16-17 ("If
it's an implied contract, then it's not in writing.").  But
Plaintiffs' position that the "price" term implied the
obligation to allow personal items on board does negate the
conclusion that the obligation is "founded upon an instrument of
writing," as the California statute puts it.  Indeed, Plaintiffs
point to a specific writing: the OTAs' "booking webpages."
According to Plaintiffs, the terms set out on those pages
(including the price) came to comprise the contract after a
passenger manifested his or her agreement by clicking the "book"
or "book it" button.  *See* Pl. Supp. Ltr. 5 (stating that "the
content of the Booking page, which had every element of the
contract, is a memorialization of the contract terms").

On my reading of the briefs, this has been Plaintiffs'
contract theory throughout.  It also tracks the Second Circuit's
framing — namely, that to assess whether Spirit's carriage
obligations included the right to carry a bag onboard, we should
look to the "price" term.  *Cox v. Spirit Airlines, Inc.*,

786 F. App'x 283, 285-86 (2d Cir. 2019).  That price term may be ambiguous, as the Second Circuit (and I) have now held, but it is still written rather than implied.  Plaintiffs have not varied meaningfully from that framing, at least since the filing of the Second Amended Complaint in May 2018.  That pleading alleges at paragraph 40 (for example) that the "Defendant represented that the cost of a ticket would be at a set amount when, in fact, the Defendant intended to, and did in fact, charge the Plaintiffs additional fees for carry-on bags . . . ." Second Am. Compl. ¶ 40, ECF No. 31.  The reference to a "set amount" is of course a reference to the price term.

Spirit now disputes that an OTA's "booking webpage" can constitute the operative agreement between Spirit and its passenger.  *See* Def. Supp. Ltr. 7.  But the price term is still set out in writing, whether in the booking webpage or (as Spirit now claims for the first time) in the digital transmission — called a "PNR" — that the OTAs sent to Spirit nanoseconds after a passenger clicked "book" on an OTA's website.  *See id*. Indeed, Spirit never actually disputes that *it had* a written contract with its passengers; instead, Spirit seeks simply to poke holes in Plaintiffs' argument about where that written contract appears.[8]  At the very least, a jury should decide the

---

[8] Indeed, at oral argument, Spirit's lawyer resolutely declined to take a position on whether *Spirit* believes that a written contract is at issue

question of whether the price term must be read to include carry-ons.  Accordingly, there is no basis to dismiss the claims of any named plaintiff on statute-of-limitations grounds at this point.

**C.    Subclasses**

Prior to my decision to certify a class, Spirit never suggested that subclasses would be necessary or even desirable. My prior order held expressly that the six OTAs' disclosures were substantially similar in all material respects, *see* Opinion 42, such that the contract claims for each OTA would stand or fall together.  Spirit does not persuasively contest this conclusion now.  Instead, Spirit picks out passages in the prior opinion where the Court noted ambiguities in Spirit's assertions of fact — for example, that Spirit's Expedia witness could not say where the "baggage fees" link appeared on its website, or what the link said (just that it was "something along the lines of check baggage fees here").  *See* Dep. of Bryan Bachrad 77:3-6, ECF No. 129-66.  But pointing out places where *Spirit's* evidence is weak is not the same as identifying a dispute of material fact that is unique to one OTA or another.

_____

here or not.  *See, e.g.*, Tr. 62:18 (the Court asks: "What do you think is the contract?"; defense counsel responds by invoking statements by the plaintiffs); *id*. at 61:8-13 (defense counsel contends that "the [OTA's] website interface is the offer and the click [of the 'Book Now' or similar button] is the acceptance.  And then, the question is do you have the memorialized contract?  It could be the confirmation email.  But if Plaintiffs' position is it's not the confirmation email, then we don't have a contract in writing.").

Spirit also fails to explain convincingly why subclasses need to be instituted *now*. Rule 23(c)(1)(C) states that an order granting (or denying) class certification "may be altered or amended before final judgment." Pursuant to this rule, a "district court has the affirmative duty of monitoring its class decisions in light of the evidentiary development of the case." *Mazzei v. Money Store*, 829 F.3d 260, 266 (2d Cir. 2016). This includes the creation of subclasses: per the Second Circuit, district courts "must define, redefine, subclass, and decertify as appropriate in response to the progression of the case from assertion to facts." *Id.; see also Chen-Oster v. Goldman, Sachs & Co*., No. 10-CV-6950, 2022 WL 3586460, at *3 (S.D.N.Y. Aug. 22, 2022) ("District courts may act *sua sponte* pursuant to Rule 23(c)(1)(C) to redefine the class.").

For the reasons set out in the prior order, I decline to order subclasses at this point in the case.

**D.    Custom-and-Usage Evidence**

My prior order said, in footnote 12, that evidence of custom and usage comes into play in determining whether contract language is ambiguous, rather than in resolving ambiguity. That statement was imprecise at best, and wrong at worst. Accordingly, the footnote shall be stricken.

Nevertheless, the change has no effect on the outcome of the issues decided in the order. It is true that Plaintiffs

will need to make a threshold showing before they can invoke
custom-and-usage evidence at trial.  Specifically, they will
need to show that the practice of including carry-ons in the
price was a "custom and usage so far known to the parties, that
it must be supposed that their contract was made in reference to
it."  *Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*,
595 F.3d 458, 471 (2d Cir. 2010) (citing *Belasco Theatre Corp.
v. Jelin Prods.*, 59 N.Y.S. 2d 42, 46 (App. Div. 1945).  The
Second Circuit has said the following about the threshold
showing:

> The precise standard for determining whether a party
> has met its burden of production with respect to
> custom-and-usage evidence has not been clearly
> articulated under New York law.  We conclude that to
> raise a genuine issue of fact as to the existence of a
> particular custom and usage, the party seeking to
> establish that custom and usage must establish, by
> competent evidence, that the practice is fixed and
> invariable.

*SR Int'l. Bus. Ins. Co. v. World Trade Center Props., LLC*,
467 F.3d 107, 135 (2d Cir. 2006).  Still, the *SR International*
case and others clearly dictate that the question should be
submitted to the jury in situations like the one presented here.
In *SR International*, the Second Circuit went on to hold:

> Where one party submits evidence that a particular
> custom or usage exists, and where the other party —
> the party to be charged with actual or constructive
> knowledge of that custom — puts forth evidence to the
> contrary, the question should be submitted to a jury
> unless no reasonable factfinder could find that such a
> custom existed.

*Id.*; *see also Dickinson v. City of Poughkeepsie*, 75 N.Y. 65, 77 (1878) (stating that if witnesses from both parties "differ as to [the] existence [of a particular custom] in the same place or in all places, . . . this would raise a question for the jury"); *accord Scott v. Brown*, 60 N.Y.S. 511, 512 (App. Term. 1899); *see also Walls v. Bailey*, 49 N.Y. 464, 476–77 (1872).

Here, the parties have submitted contrary evidence, at least, on the question of whether the right to a carry-on bag was widespread in the airline industry during the relevant period.  Pls.' Response to Def.'s Local Rule 56.1 Statement & Counterstatement ¶¶ 48–51, ECF No. 134-1 (citing Expert Report of Matthew Klint ¶¶ 7–8, 20, ECF No. 134-5); Def. SJ Br. 4–5 (citing Expert Report of Darin Lee, ECF No. 129-74).  Indeed, Spirit concedes that it was the first major airline to charge for carry-on bags, *see* Def. SJ Br. 13 ("Spirit introduced the practice in August 2010."), and that it was almost two years before any other airline followed suit.  *See id.* ("Allegiant followed Spirit, unbundling carry-on bags in April 2012."). Spirit does not seriously dispute Plaintiffs' expert's report that in 2012, over 99 percent of the U.S. market included carry-on bags in the price of a plane ticket; rather, it argues that the national market share is not the correct measure of consumer awareness.  Def.'s Local Rule 56.1 Reply & Response to Pls.'

Counterstatement ¶ 49, ECF No. 136-1.  Spirit focuses its
arguments on the "ultra-low-cost" segment of the airline
industry, arguing that it is "dispositive" that "the entire ULCC
industry segment eventually charged separately for carry-on bags
by 2014."  Def. SJ Br. 15.  But as noted in the Court's initial
opinion, Spirit provides no support for defining the industry so
narrowly.

     As an aside: this is not the usual case of custom-and-
usage evidence.  Plaintiffs here are not seeking to *imply* the
existence of a term that is otherwise absent from the contract;
instead, they are talking about what the reasonable consumer
would understand the "price" term to include in this context.
*Cf. Glob. Reinsurance Corp. of Am. v. Century Indem. Co.*, 22
F.4th 83, 98 (2d Cir. 2021) (defendant offered evidence of
reinsurance industry custom and usage to show that reinsurance
certificates incorporated the defense costs provisions found in
the underlying policies).  Moreover, we are not dealing with
specialized industry jargon, unlike the cases Spirit cites for
its view of custom-and-usage evidence — specifically *Law
Debenture*, 595 F.3d at 468-69 (considering custom and usage in
the securities industry to assess whether an indenture's
reference to "common stock traded on a United States national
securities exchange" included American Depositary Shares), and
*SR International*, 467 F.3d at 132-34 (considering custom and

usage in the insurance industry to assess the meaning of a "per occurrence" provision in a property insurance policy).  In this vein, consider the following hypotheticals:

- A consumer admiring a pair of sneakers is told that their price is $100.  He accepts the offer and pays by credit card.  Only after he leaves the store does he realize that no laces have been provided; when he returns, the store seeks to charge an additional $5 for the laces.

- A client walks into a barber shop and is told that a haircut is $25.  After his hair is washed and cut, the salon presents him a bill for $30, on the basis that the hair wash was not included in the $25 price.

Are we really dealing in the specialized world of custom and usage in these cases?  Or (as Plaintiffs suggest) are we confronting the *prior* question of what a reasonable consumer would understand the price term (or the definition of the product or service) to subsume?[9]  This latter inquiry is primary in contract law.  To frame this case in terms used by Judge Hand in 1917, the elementary question is "what the law supposes men

---

[9] On appeal, the Second Circuit framed the dispute over personal items as emanating from ambiguity in the price term.  One might also ask whether the contract contained ambiguity in the description of the "service" to be provided in return for the price — namely, whether the service to be provided (the flight) included the right to a carry-on bag.  But either way, we would be talking about an ambiguity in an existing term, rather than looking to custom-and-usage evidence to imply the existence of a wholly new term in the contract.

[and women] would generally mean when they used" the "price" term as Spirit's OTAs did here. *Eustis Mining Co. v. Beer, Sondheimer & Co.,* 239 F. 976, 984 (S.D.N.Y. 1917). Plaintiffs argue this point as follows: the evidence of Spirit's (and the ULCCs') "miniscule" market share constitutes "part of the information mix the jury can consider in determining what a reasonable consumer would understand," separate and apart from the custom-and-usage analysis. Pl. Recons. Opp. 5. For these reasons, it is far from clear at this point that Spirit is correct in its view that this is really custom-and-usage evidence to begin with.

This question is largely academic at this point, however. The evidence of market practice (and Spirit's market share) will be admissible one way or the other — either as custom-and-usage evidence submitted to the jury per *SR International*, *supra*, or as *Eustis Mining* evidence of what reasonable men and women "would generally mean [and understand]" about the price of an airline flight during the class period. I need not resolve the precise basis (or bases) for the admission of such evidence now, and contrary to Spirit's position, no modification of the Opinion is necessary or appropriate on this ground.

E.    **The OTAs as Spirit's "Agents"**

         The original order stated that the online travel
agents at issue functioned as Spirit's agents.  Opinion 4, 14.
This characterization was predicated on both parties' agreement
that the plaintiff-passengers entered into a binding contract
with Spirit despite never having interacted with it directly.
If a passenger can enter a binding contract by clicking a "Book
It" button on an OTA's website, it must have been (the Opinion
assumed) because the OTA had the authority to bind Spirit.  In
its motion for reconsideration, however, Spirit says this is
incorrect: that the OTAs acted as the *passengers'* agents, not
the airline's.  In the end, the Opinion's characterization of
the agency relationship was immaterial to any holding contained
therein.  As such, and given Spirit's argument, I will order it
stricken.

F.    **Spirit's "Publicly Available" Contract of Carriage.**

         Finally, Spirit argues that its contract of carriage
document was posted in May 2012, not 2017.  The Opinion used the
latter date, citing Spirit's own submissions.  *See* Opinion 31
(citing Spirit's statement of undisputed material facts, *see*
Def.'s Local Rule 56.1 Statement ¶ 44, ECF No. 129-2.).  Spirit
now says that this date "regrettably" appeared in the statement

of material facts as a "typo."  Def. Recons. Br. 14-15.  At

Spirit's request, I amend the order to reflect the 2012 date.


      SO ORDERED.


                                                 /s/ Eric Komitee
                                           ERIC KOMITEE
                                           United States District Judge


Dated:     February 14, 2023
           Brooklyn, New York